Filed 2/21/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KELLY MICHELE WOLFE,<br><br>    Defendant and Appellant. | G052920<br><br>(Super. Ct. No. 14HF2315)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed.

Corona & Peabody and Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Kelly Michele Wolfe killed an innocent pedestrian while driving under the influence of alcohol.  The prosecution charged Wolfe with an implied malice murder (colloquially known as a *Watson* murder).[1]  The trial court refused to instruct the jury on involuntary or vehicular manslaughter; it is well-settled that these are not lesser included offenses.  The court also instructed the jury that voluntary intoxication was not a defense to an implied malice murder; this is also an accurate statement of California law.

The jury convicted Wolfe of murder and other offenses.  Wolfe makes three claims:  the evidence was insufficient to sustain the murder conviction, the failure to allow a manslaughter instruction as a lesser included offense violates the equal protection clause, and the failure to allow voluntary intoxication as a defense violates due process.

We disagree and affirm the judgment.


I

FACTS AND PROCEDURAL BACKGROUND

On July 4, 2013, at about 8:30 p.m., Wolfe left a San Clemente bar and was driving to her nearby home when she struck and killed a pedestrian.  Wolfe's blood-alcohol content (BAC) was about .34 percent.  The evidence at trial encompassed:  Wolfe's prior knowledge about the dangers of drinking and driving; Wolfe's alcohol consumption before the collision; the circumstances of the collision itself; and what happened afterwards, including Wolfe's arrest.

*Prior DUI Knowledge*

In 1994, Wolfe pleaded guilty to a charge of driving under the influence in Nevada.  Wolfe was required to attend a victim impact panel in which offenders learn about the consequences of drinking and driving.  During the 90-minute presentation,

---

[1] *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).

2

Wolfe was exposed to statistical information and presentations by "injured victims or surviving family members of deceased victims."

In 2008, Wolfe renewed her California Driver's License. Wolfe signed a Department of Motor Vehicles (DMV) renewal form, which included the following statement: "I am hereby advised that being under the influence of alcohol or drugs, or both, impairs the ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If I drive while under the influence of alcohol or drugs, or both, and as a result, a person is killed, I can be charged with murder."[2]

*Alcohol Consumption Before the Collision*

Wolfe and her husband Mike Rosney were regular customers at Knuckleheads, a bar in San Clemente. The couple had two vehicles that they would regularly drive to the bar, Rosney's red convertible and Wolfe's white Volkswagen van. Wolfe and Rosney usually called a local taxi driver, Thomas "Tommy Taxi" Meadows, to take them home when they felt they could not drive safely. Wolfe ordinarily called Meadows for a ride home two to three times a month.

On July 4, 2013, at about 11:00 a.m., Wolfe and Rosney drove separately to Knuckleheads for lunch. After eating lunch, Rosney and Wolfe left in Rosney's car to attend a birthday party in Mission Viejo. Wolfe drank an unknown quantity of wine at the party. At about 4:00 p.m., Rosney drove Wolfe back to the couple's home in

---

[2] Both parties quoted from the DMV renewal form (an admitted exhibit) in their briefs, but the document was not included as part of the reporter's or clerk's transcripts. In the future, we advise the parties that the proper procedure under these circumstances is to request the transmission of such exhibits to the reviewing court. (See Cal. Rules of Court, rule 8.224(a)(b) & (c).) In this case, on our own motion, we transmitted all of the exhibits for review, which included the DMV renewal form, videos, diagrams, photographs, maps, etc. (See also Cal. Rules of Court, rule 8.224(d).)

Capistrano Beach; they dropped off some leftovers, and then they returned to Knuckleheads at about 6:15 p.m.

When they entered the bar, Rosney ordered two shots and two beers for himself and Wolfe. The bartender, Serena Stewart, noticed that Wolfe had been drinking, although Wolfe did not appear to be "overly intoxicated." Wolfe drank the shot at the bar and took her beer glass outside. After about 45 minutes, Wolfe came back inside the bar. Wolfe's glass was mostly empty, and she told Rosney that she was ready to leave. Rosney told Wolfe that he had just ordered another shot and a beer for himself and a friend. Wolfe put her glass on the bar and walked out the front door.

Rosney continued drinking for 10 to 15 minutes. Rosney asked Stewart for his tab and said he had "an angry wife" waiting for him in the car. Stewart advised Rosney: "You guys have been drinking. It's a holiday. There's lots of cops out. You are calling Tommy Taxi, right?" Rosney responded: "Yes." Rosney picked up a phone, but Meadows later testified that neither Rosney nor Wolfe called him for a ride that evening. Rosney left the bar, walked to his car, and eventually drove home. Rosney did not see Wolfe or notice whether her van was still parked outside the bar.

*The Collision*

Shortly after 8:00 p.m., 12-year-old Mason, and his grandmother, Marthann, were walking from their family's beachside vacation home towards the beach where they planned to watch fireworks with their family. Mason was blind from birth (as in years past, it was anticipated that Marthann would describe the fireworks to her grandson). As they walked along the Pacific Coast Highway (PCH), Mason held a white cane in his right hand and held on to his grandmother's arm with his left hand.

At about 8:33 p.m., Marthann and Mason stood in the gutter near the bike lane, waiting to cross the street. At that moment, Wolfe was driving her van northbound on PCH and failed to negotiate a curve in the road. Wolfe veered out of the traffic lane

4

into the bike lane. Wolfe's van was headed directly towards Marthann and Mason, as well as others who were seated nearby. Marthann pushed Mason away just before the van struck her; Marthann died at the scene. Mason heard a loud "thud"; his grandmother's arm was no longer within his reach. Mason sustained injuries to his face and right leg. There were no skid marks at the site of the collision.

*After the Collision*

After the collision, Wolfe continued driving northbound on PCH towards her apartment. As a result of the impact, the van's passenger windshield was shattered, its horn was blaring, one or both of its headlights were out, and its front grill section was crumpled and severely damaged. The van stalled as it made a right hand turn from PCH onto a side street. As Wolfe tried to restart the van, its horn kept blaring intermittently. Wolfe was eventually able to restart the van and drive to her home, which was right up the hill. Wolfe nearly clipped a parked car before she stopped abruptly and parked askew on the street. Several witnesses noticed that Wolfe remained seated in the van for a few minutes. One witness said that Wolfe had "a very shocked look on her face." Wolfe eventually got out of the van with her purse and walked into her home.

At about 8:35 p.m., Deputy Anton Pereyra arrived in front of Wolfe's residence; he was responding to a dispatch call regarding a possible vehicle involved in the fatal collision on PCH. Pereyra saw the van and noticed that it had sustained major damages to its front passenger side; he "could see pieces of hair and scalp in the windshield as well as on the [vertical support]." When Pereyra looked inside of the van he noticed "broken glass particles across the dashboard, the passenger seat, and the floorboard." Pereyra ran the vehicle's license plate and learned that it was associated with Wolfe's address.

As Deputy Pereyra walked to Wolfe's apartment, he saw Rosney sitting on the front porch drinking beer. Pereyra asked Rosney several questions, but Rosney was

5

uncooperative and argumentative. Rosney eventually told Pereyra that he assumed Wolfe was inside the home, but Rosney said that he had not spoken to Wolfe since they separately arrived at their home from Knuckleheads bar.

At about 8:40 p.m., Sergeant Jonathan Daruvala arrived at the home and asked Wolfe to walk outside. Daruvala noticed that Wolfe was unsteady as she walked, she smelled of alcohol, and her eyes were bloodshot and watery. Wolfe told Daruvala that she had consumed two glasses of wine two to three hours earlier. Daruvala conducted multiple field sobriety tests; Wolfe performed poorly on all of them. Daruvala arrested Wolfe and took her to the hospital to have her blood drawn. Daruvala noticed that in the backseat of his police vehicle there were broken pieces of glass. Inside of Wolfe's purse there were also pieces of broken glass and Wolfe's driver's license, which had expired.

Wolfe's blood draw occurred at about 10:39 p.m., and later revealed a blood alcohol content (BAC) of .307 and .314 percent. At trial, a forensic expert opined that given the average rate of alcohol elimination from the bloodstream, Wolfe's BAC at the time of the collision was somewhere between .34 and .35 percent. The expert further opined that based on Wolfe's weight, gender, and other factors, she had consumed the equivalent of 14 to 16 standard alcoholic drinks prior to the collision.

*Court Proceedings*

The prosecution filed an amended information charging Wolfe with murder, hit and run with permanent injury or death, DUI causing great bodily injury (GBI) (Mason), driving with a BAC level of .08 percent or greater causing GBI (Mason), driving without a license, and failing to yield the right of way to a blind pedestrian. (Pen. Code, § 187; Veh. Code, §§ 20001, subd. (a), 23153, subds. (a) & (b), 12500, subd. (a),

6

21963.)[3]  The information further alleged that Wolfe had driven with a BAC of .15 percent or greater.  (Veh. Code, § 23578.)  A jury found Wolfe guilty of all counts and found the sentencing allegation to be true.  The court imposed an aggregate sentence of 18 years to life.

## II
## DISCUSSION

Wolfe claims:  the evidence was insufficient to sustain the *Watson* murder conviction; the failure to allow voluntary or vehicular manslaughter instructions as lesser included offenses violates the equal protection clause; and the failure to allow voluntary intoxication as a defense to an implied malice murder charge violates due process.

We shall address each claim in turn.

### A.  *Sufficiency of the Evidence*

Wolfe claims that the prosecution presented insufficient evidence that "she was subjectively aware that her actions were dangerous to human life and that she deliberately acted with conscious disregard for human life."  We disagree.

In reviewing the sufficiency of the evidence, we must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  It is the jury, not an appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.  (*Ibid.*)  The appellate court may not substitute its judgment for that of the jury or

---

[3] Further undesignated statutory references will be to the Penal Code.

7

reverse the judgment merely because the evidence might also support a contrary finding. (*Id*. at p. 577.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§187, subd. (a).) When a person commits a murder without premeditation and deliberation, it is of the second degree. (§189.) In a second degree murder, the "malice may be express or implied." (§188.) "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

Malice may be implied when a person willfully drives under the influence of alcohol. (*Watson*, *supra*, 30 Cal.3d. 290.) In *Watson*, the defendant had been drinking at a bar and drove with a BAC of .23 percent. The defendant struck another vehicle in an intersection at 70 miles per hour, killing its driver and a passenger. (*Id*. at pp. 293-294.) In an information, the prosecution charged the defendant with two counts of second degree murder and related charges. (*Id*. at p. 294.) In an appeal from a pretrial motion to dismiss the murder counts (§ 995), the defendant argued that in homicide cases involving vehicles, the prosecution can only charge a person with vehicular manslaughter and not murder. (*Watson*, at p. 294.) The Supreme Court disagreed and held "that if the facts surrounding the offense support a finding of 'implied malice,' second degree murder may be charged[.]"[4] (*Ibid*.)

The *Watson* court then analyzed the facts presented at the defendant's preliminary hearing to determine if there was probable cause to proceed to trial. (*Watson*, *supra*, 30 Cal.3d at pp. 300-301.) The court noted the defendant was legally intoxicated

---

[4] The Legislature later approved of this ruling and clarified that the statute defining the elements of a vehicular manslaughter charge "does not prohibit or preclude a charge of murder . . . , consistent with the holding of the California Supreme Court in [*Watson*, *supra*,] 30 Cal.3d 290." (§ 192, subd. (e).)

8

and that he had driven to a bar alone so "he must have known that he would have to drive it later. It also may be presumed that defendant was aware of the hazards of driving while intoxicated." (*Id.* at p. 300.) The court also noted that just before colliding with the victims' car, the defendant had been driving at excessive speeds, ran a red light, and narrowly avoided hitting another car. "He thereafter resumed his excessive speed before colliding with the victims' car . . . . In combination, these facts reasonably and readily support a conclusion that defendant acted wantonly and with a conscious disregard for human life." (*Id.* at p. 301.) The court concluded that at trial "it may be difficult for the prosecution to carry its burden of establishing implied malice to the moral certainty necessary for a conviction. Moreover, we neither contemplate nor encourage the routine charging of second degree murder in vehicular homicide cases. We merely determine that the evidence before us is sufficient to uphold the second degree murder counts in the information, and to permit the prosecution to prove, if it can, the elements of second degree murder." (*Ibid.*)

Following the Supreme Court's ruling in *Watson*, appellate courts have upheld numerous murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol. (See, e.g., *People v. Lima* (2004) 118 Cal.App.4th 259; *People v. Autry* (1995) 37 Cal.App.4th 351; *People v. Murray* (1990) 225 Cal.App.3d 734; *People v. McCarnes* (1986) 179 Cal.App.3d 525; *People v. Olivas* (1985) 172 Cal.App.3d 984.) [5] Generally, these opinions "have relied on some or all of the following factors" that were present in *Watson*: "(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*People v. Autry*, *supra*,

---

[5] Wolfe cites these cases and attempts to distinguish each of them based on their particular facts. But Wolfe has cited no published opinion in which a *Watson* murder conviction has been reversed based on a claim of insufficiency of the evidence; we have been unable to locate any such case.

9

37 Cal.App.4th at p. 358.)  However, "nowhere does the opinion in *Watson* state that all of the factors present in that case are necessary to a finding of second degree murder. Rather, the opinion states that the presence of those factors was sufficient *in that case* . . . ."  (*People v. Olivas*, *supra*, 172 Cal.App.3d at p. 988.)

Here, when we review the facts *in this case* we find sufficient evidence to support the jury's determination that Wolfe was subjectively aware that driving under the influence of alcohol was dangerous to human life.  Wolfe had attended a victim impact panel, which had reviewed the consequences of drinking and driving.  (See *People v. Murray*, *supra*, 225 Cal.App.3d at p. 746 [a jury can infer defendant's knowledge from exposure to drinking and driving educational programs].)  Further, Wolfe had signed a DMV license renewal form, which explicitly told her of one of the serious consequences of driving under the influence:  that she could be charged with murder.  Wolfe had also previously called "Tommy Taxi" for a ride home after she had been drinking on many prior occasions.  The jury could have reasonably inferred that Wolfe did this because she was aware of the possible lethal consequences of driving under the influence of alcohol.

There is also evidence to support the jury's determination that on July 4, 2013, Wolfe deliberately drove with conscious disregard for human life.  Wolfe drove home from her neighborhood bar with a BAC of over four times the legal limit.  In order to reach that level of intoxication, an expert testified that Wolfe must have consumed the equivalent of 14 to 16 standard alcoholic drinks.  Given Wolfe's knowledge of the consequences of driving under the influence—including the possibility of death and a murder conviction—a jury could reasonably infer that Wolfe consciously disregarded that knowledge and drove without regard to human life based on her level of her intoxication. Further, given the circumstances of the collision itself and Wolfe's flight from the crime scene, a jury could reasonably infer that Wolfe was subjectively aware that she had killed or seriously injured a human being; yet Wolfe continued to drive home.

10

Wolfe argues that there was no evidence that she intended to drive home before she began to drink. Wolfe maintains that unlike the defendant in *Watson*, who drove to a bar alone, *Wolfe* was with her husband, Rosney, who had driven her to the bar in his vehicle. However, Wolfe had her own vehicle available to her at the bar because she had left it there earlier in the day. The jury could have reasonably inferred that before Wolfe began drinking she did, in fact, intend to drive herself home. Given the highly deferential standard of review, we cannot second-guess any reasonable interpretations of the evidence by the jury. (See *People v. Johnson*, *supra*, 26 Cal.3d at p. 577.)

Similarly, Wolfe argues that unlike *Watson* and other cases, there was no evidence of "highly dangerous" driving. But, at a minimum, the evidence reasonably showed that Wolfe was unable to keep her vehicle within her designated traffic lane due to her intoxication. A jury could reasonably conclude that this inability to stay in a lane does, in fact, qualify as "highly dangerous" driving, particularly given the dangerous consequences, as unfortunately demonstrated by Marthann's death. Again, we cannot second-guess the jury's reasonable interpretations of the evidence.

In sum, there is substantial evidence to support the murder conviction.

## B. Equal Protection

Wolfe argues that unlike other defendants charged with murder, the jury in her case did not have the option of convicting her of manslaughter as a lesser included offense because she committed the homicide while driving a vehicle; thus, she argues that this disparity in treatment of similarly situated groups violates her constitutional right to equal protection under the law. She is mistaken.

### 1. The Law Regarding Lesser Included Offenses

Generally, when a defendant is charged with a crime, the trial court must instruct the jury on any lesser included offenses that are supported by the evidence.

11

(*People v. Breverman* (1998) 19 Cal.4th 142, 154.) "Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.) However, without the consent of the prosecutor, a court has no obligation to instruct on *lesser related* offenses, which are not *necessarily included* in a charged crime. (*Id*. at p. 136.)

Again, in a murder charge: "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore*, *supra*, 59 Cal.4th at p. 133.) In contrast, involuntary manslaughter is "the unlawful killing of a human being without malice." (§ 192, subd. (b).) Vehicular manslaughter is a specific type of manslaughter. (§ 192, subd. (b).) "Gross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice . . . where the driving was in violation of [DUI laws] . . . ." (§ 191.5, subd. (a).)

When the prosecution charges a defendant with a *Watson* murder, a vehicular manslaughter charge *may be related to*, but it is *not necessarily included within*, the murder charge. (*People v. Sanchez* (2001) 24 Cal.4th 983, 990 (*Sanchez*), overruled on another point in *People v. Reed* (2006) 38 Cal.4th 1224, 1228-1229.) In *Sanchez*, the defendant drove with a BAC of .17 percent, crashed into another vehicle, killing its passenger. (*Sanchez*, at pp. 986-987.) The jury convicted the defendant of murder, gross vehicular manslaughter while intoxicated, and other offenses. (*Id*. at p. 986.) The defendant argued that the vehicular manslaughter charge was necessarily included within the murder charge, and he could not be convicted of both. (*Id*. at p. 989.) The Supreme Court disagreed, noting that two elements of this particular vehicular manslaughter charge were: 1) the defendant's use of a vehicle; and 2) his intoxication. (*Id*. at p. 991.) Since a second-degree (implied malice) murder conviction does not necessarily require

12

proof of either of those two elements, the court concluded that the lesser crime was not necessarily included within the greater. (*Id*. at pp. 992-993.)

A dissenting justice in *Sanchez* rejected the majority's analysis. (*Sanchez*, *supra*, 24 Cal.4th at pp. 1001-1002 (dis. opn. of Kennard, J.).) Justice Kennard noted the long-standing distinction between murder and manslaughter: malice. That is, a murder requires proof of malice, while a manslaughter does not. The dissenting opinion maintained that "for some 150 years California has treated *manslaughter*—an unlawful killing without malice—as an offense necessarily included in the greater crime of murder. Gross vehicular manslaughter while intoxicated is simply a form of manslaughter." (*Ibid*.) Justice Kennard predicted that because of the majority's holding: "When an intoxicated driver becomes involved in a fatal accident, a prosecutor may elect to charge the driver only with murder, without also charging any form of vehicular manslaughter." (*Ibid*.) The dissenting opinion lamented that "juries in these instances will face the difficult and troubling all-or-nothing choice between a murder conviction and an acquittal." (*Ibid*.)

Here, the prosecution charged Wolfe only with murder (as to Marthann's death), and no lesser related offense of vehicular manslaughter. At the conclusion of the trial, Wolfe asked the court to instruct the jury on involuntary and/or gross vehicular manslaughter as lesser included offenses. Wolfe argued that the jury should have the option of convicting her of some lesser form of homicide, in the event that the jurors were to find that the prosecution had failed to prove malice.

The trial court denied Wolfe's request. The court noted that the prosecution had made a "tactical decision" to file a murder charge without also charging a gross vehicular manslaughter charge (as Justice Kennard predicted prosecutors may elect to do as a result of the majority's ruling in *Sanchez*). (See *Sanchez*, *supra*, 24 Cal.4th at pp. 1001-1002 (dis. opn. of Kennard, J.).) The court said that manslaughter was "certainly a lesser related offense." However, the court ruled that "vehicular manslaughter is not a

13

lesser included offense to murder in any way, shape, or form. And that's spelled out . . . in [*Sanchez*, *supra*, 24 Cal.4th at page 992]."

The trial court's ruling was undoubtedly correct. As far as the crime of involuntary manslaughter, the court was prohibited from giving that instruction because the crime does "not apply to acts committed in the driving of a vehicle." (§ 192, subd. (b).) As far as crime of gross vehicular manslaughter, the court properly refused Wolfe's request for that instruction because the prosecution did not consent to the giving of the lesser related offense instruction and because of the California Supreme Court's ruling in *Sanchez*, *supra*, 24 Cal.4th 983.

In this appeal, Wolfe recognizes that just like the trial court, we are generally required to adhere to the laws enacted by the Legislature and the rulings of our Supreme Court. Nevertheless, Wolfe argues that the jury's all-or-nothing choice between murder and acquittal violates her (and other similarly situated defendants) right to equal protection under the law. Wolfe argues that had she committed a homicide by a means other than a vehicle (such as a firearm), the jury would not have been presented with a difficult all-or-nothing choice between murder and acquittal; rather, the jury would have been given the choices of murder, manslaughter, and acquittal. She is mistaken.

### 2. *The Analytical Framework of an Equal Protection Claim*

The United States Constitution as originally written had no provision guaranteeing equal treatment under the law. After the Civil War, discrimination against former slaves led to the enactment of the Fourteenth Amendment, which provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., 14th Amend., § 1.) Since its passage, courts have formulated a general analytical framework for analyzing equal protection claims. (*People v. Lynch* (2012) 209 Cal.App.4th 353, 358.) The California Constitution also contains an equal protection

14

clause (Cal. Const., art. 1, § 7); the federal and state clauses are analyzed in substantially the same manner. (*Lynch*, at p. 358.)

An analysis of an equal protection claim proceeds as follows: "We first ask whether the two classes are similarly situated with respect to the purpose of the law in question, but are treated differently. [Citation.] If groups are similarly situated but treated differently, the state must then provide a rational justification for the disparity. [Citation.] However, a law that interferes with a fundamental constitutional right or involves a suspect classification, such as race or national origin, is subject to strict scrutiny requiring a compelling state interest. [Citation.]" (*People v. Lynch*, *supra*, 209 Cal.App.4th at p. 358.) Equal protection claims are reviewed de novo. (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1338.)

Here, the equal protection issues concern, respectively: a) whether a defendant charged with an implied malice murder committed as a result of driving a vehicle is similarly situated and receives disparate treatment as compared to other defendants charged with implied malice murder committed by other means; b) whether the alleged disparate treatment interferes with a fundamental right and is therefore subject to strict scrutiny; or c) if not, is there a rational basis for the alleged disparate treatment.

*a. There is no disparate treatment of similarly situated defendants.*

Wolfe argues that a criminal defendant charged with an implied malice murder as a result of a vehicular homicide is "at a substantial disadvantage when compared with a defendant charged with that same crime committed by some other instrumentality." Wolfe maintains that defendants such as her "are exposed to an unwarranted risk of suffering a murder conviction under circumstances where defendants in the similarly situated class would be found guilty of the lesser-included offenses of manslaughter or involuntary manslaughter." Wolfe bases her argument on a faulty premise.

15

"A defendant claiming that state legislation violates equal protection principles must first demonstrate that the laws treat persons similarly situated in unequal manner." (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1302 (*Timms*).)  But not all defendants charged with murder are entitled to a manslaughter instruction as a lesser included offense.  A defendant is entitled to an instruction on a lesser included offense only if the record contains substantial evidence of the lesser crime.  (*People v. Moore* (2011) 51 Cal.4th 386, 408-409.)  Thus, in some implied malice murder trials that do not involve a vehicle, the court is not required to instruct the jury on manslaughter as a lesser included offense when there is no substantial evidence to support the lesser charge.  (See, e.g., *People v. Evers* (1992) 10 Cal.App.4th 588, 592, 598 [defendant convicted of implied malice murder of two-year-old son by blunt force trauma not entitled involuntary manslaughter instruction where substantial evidence did not support it]; see also, e.g., *People v. Dixon* (1995) 32 Cal.App.4th 1547, 1550, 1556-1558 [defendant convicted of implied malice murder by means of a firearm not entitled to involuntary manslaughter instruction where there was no substantial evidence to support it].)

Contrary to Wolfe's premise, there are other defendants charged with implied malice murder who are not entitled to have the jury instructed on manslaughter as a lesser included offense, regardless of the instrumentality of the crime.  That is, juries in those cases may be presented with the same all-or-nothing choice that Wolfe identifies as disparate treatment in her case.

Thus, Wolfe has failed to establish the threshold requirement of an equal protection claim:  disparate treatment of similarly situated persons.  Nonetheless, even if we were to overlook this fatal defect, Wolfe has failed to establish the other essential requirements of a valid equal protection claim.

16

*b. There is no fundamental right to lesser included offense instructions.*

Wolfe argues "the classification under examination impacts the fundamental rights of defendants like appellant. They are denied the rights to have the jury consider a verdict of manslaughter or involuntary manslaughter if the prosecutor fails to prove beyond a reasonable doubt the accused acted with implied malice aforethought. The exposure to a potentially longer prison term violates protected personal liberty rights. Therefore, heightened scrutiny is required for the constitutional issue presented here." Wolfe is mistaken.

Again, the California Supreme Court has explicitly held that vehicular manslaughter is not a necessarily lesser included offense in an implied malice murder charge. (*Sanchez*, *supra*, 24 Cal.4th at pp. 992-993.) Further, "there is no federal constitutional right of a defendant to compel the giving of lesser-related-offense instructions." (*People v. Rundle* (2008) 43 Cal.4th 76, 148, disapproved of on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Indeed, even a trial court's obligation to instruct a jury as to *lesser included* offenses is based on state constitutional law, not the federal Constitution. (*Rundle*, at pp. 141-142, citing *People v. Breverman*, *supra*, 19 Cal.4th at pp. 154-155.) Therefore, Wolfe has no fundamental constitutional right to have the jury instructed as to a manslaughter charge, even if it were a lesser included offense, which it is not.

Moreover, although a murder conviction necessarily exposes a defendant to a longer prison term than a manslaughter conviction, this does not trigger a strict scrutiny test within the context of an equal protection claim. (See *People v. Owens* (1997) 59 Cal.App.4th 798, 802 ["California courts have never accepted the general proposition that 'all criminal laws, because they may result in a defendant's incarceration, are perforce subject to strict judicial scrutiny'"; see also *People v. Mitchell* (1994) 30 Cal.App.4th 783, 796 ["Determining gradations of [criminal] culpability . . . does not implicate the strict scrutiny test for equal protection purposes"].) Criminal defendants do "'not have a

fundamental interest in a specific term of imprisonment or in the designation a particular crime receives.' [Citations.]" (*People v. Wilkinson* (2004) 33 Cal.4th 821, 838.)

In short, Wolfe's claim does not implicate her fundamental rights. Thus, even if we were to overlook Wolfe's faulty premise that she received disparate treatment, her equal protection claim would not be evaluated under a strict scrutiny test. Rather, it would be evaluated under a rational basis test. (See *People v. Wilkinson*, *supra*, 33 Call.4th at p. 838 [applying rational basis test to alleged sentencing disparities].)

### c. There is a rational basis for the statutory charging scheme.

Wolfe argues that her alleged disparate treatment (the prosecution's ability to charge her with murder without the jury also being given an instruction on a lesser related crime of manslaughter) does not survive rational basis review. We disagree.

Under the rational basis test, in an equal protection claim, the challenged classification need only further a legitimate state interest. (*City of Cleburn v. Cleburn Living Ctr.* (1985) 473 U.S. 432, 439-441 (plur. opn. of White, J.).) "In ordinary equal protection cases not involving suspect classifications or the alleged infringement of a fundamental interest, the classification is upheld if it bears a rational relationship to a legitimate state purpose." (*Weber v. City Council* (1973) 9 Cal.3d 950, 958-959.) Indeed, courts may go so far as to engage in speculation as to the government's justification for the unequal treatment. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.)

In applying the rational basis test, the California Supreme Court has held that "neither the existence of two identical criminal statutes prescribing different levels of punishment, nor the exercise of a prosecutor's discretion in charging under one such statute and not the other, violates equal protection principles." (*People v. Wilkinson*, *supra*, 33 Cal.4th at p. 838.) The court noted that "numerous factors properly may enter into a prosecutor's decision to charge under one statute and not another, such as a

18

defendant's background and the severity of the crime, and so long as there is no showing that a defendant 'has been singled out deliberately for prosecution on the basis of some invidious criterion,' . . . the defendant cannot make out an equal protection violation. [Citation.]"  (*Id*. at pp. 838-839.)

Here, the prosecution charged Wolfe with an implied malice murder without also charging her with a vehicular manslaughter.  This charging discretion is permitted as a result of the California Supreme Court's holdings in *Watson*, *supra*, 30 Cal.3d 290, and *Sanchez*, *supra*, 24 Cal.4th 983, and by statute.  (See § 191.5, subd. (e) [the gross vehicular manslaughter statutes do not preclude the prosecution from charging murder under *Watson*]; see also *City and County of San Francisco v. Strahlendorf* (1992) 7 Cal.App.4th 1911, 1915 ["Generally, we presume that the Legislature is aware of appellate court decisions"].)  We hold that the Legislature's charging scheme is rationally related to a legitimate governmental purpose:  to appropriately punish—and also perhaps to discourage—people from engaging in the highly dangerous conduct of driving under the influence.  (See *People v. Wells* (2006) 38 Cal.4th 1078, 1086 ["'a drunk driver is not at all unlike a "bomb," and a mobile one at that'"].)

In sum, Wolfe has failed to show disparate treatment of similarly situated persons, or that the government has subjected her to disparate treatment based on a fundamental constitutional right or invidious criteria (race, religion, ethnicity, etc.).  Further, there is a rational basis for allowing prosecutors to charge DUI drivers who commit homicides solely with implied malice murder, rather than manslaughter.  Thus, Wolfe has failed to establish a violation of the equal protection clause.

*C.  Due Process Claim*

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, *when charged*

*with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought*." (§ 29.4, subd. (b), italics added, formerly § 22.)[6]

Over Wolfe's objection, the trial court instructed the jury that: "Voluntary intoxication is not a defense to implied malice [murder]."[7] Wolfe concedes that the instruction accurately states the law. Nevertheless, she argues that the instruction violated her right to due process "because it barred the jury from considering exculpatory evidence . . . relevant to negating the mental state required for the crime of implied-malice second degree murder." We disagree. Section 29.4 (b), does not violate due process.

The federal and state Constitutions prohibit the state from depriving any person of life, liberty, or property without due process of law. (U.S. Const., 14th Amend., § 1; Cal. Const., art. 1, § 7.) In a criminal trial, a defendant has "the right to a fair opportunity to defend against the State's accusations." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 294.) However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." (*United States v. Scheffer* (1998) 523 U.S. 303, 308 (plur. opn. of Thomas, J.).) "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" (*Ibid*.)

A statute that limits the admissibility of evidence of voluntary intoxication to negate evidence of a defendant's mental state does not violate due process. (*Montana*

---

[6] Hereafter, section 29.4 (b).

[7] The special instruction also defined voluntary intoxication: "A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assume the risk of that effect."

*v. Egelhoff* (1996) 518 U.S. 37, 58 (conc. opn. of Ginsburg, J.) (*Egelhoff*).) In *Egelhoff*, the United States Supreme Court considered a due process challenge to a Montana statute, which provided that voluntary intoxication "'may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense.'" (*Id.* at pp. 39-40 (plur. opn. of Scalia, J.).) Four justices joined in a plurality opinion upholding the constitutionality of the statute: "The people of Montana have decided to resurrect the rule of an earlier era, disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue. Nothing in the Due Process Clause prevents them from doing so . . . ." (*Id.* at p. 56 (plur. opn. of Scalia, J.).)

In *Egelhoff*, Justice Ginsburg wrote a concurring opinion which represents the holding of the court. (See *Marks v. United States* (1977) 430 U.S. 188, 193.) Justice Ginsburg did not characterize the Montana statute as "a rule designed to keep out 'relevant, exculpatory evidence[.]'" (*Egelhoff*, *supra*, 518 U.S. at pp. 56-57 (conc. opn. of Ginsburg, J.).) Rather, Justice Ginsburg characterized Montana's statutory ban on a jury's consideration of evidence of voluntary intoxication "as a legislative judgment regarding the circumstances under which individuals may be held criminally responsible for their actions." (*Id.* at p. 57 (conc. opn. of Ginsburg, J.).) Justice Ginsburg concluded that: "Defining *mens rea* to eliminate the exculpatory value of voluntary intoxication does not offend a 'fundamental principle of justice,' given the lengthy common-law tradition, and the adherence of a significant minority of the States to that position today." (*Id.* at pp. 58–59 (conc. opn. of Ginsburg, J.).)

California's prohibition against voluntary intoxication as a defense to certain criminal charges (§ 29.4 (b)), is similar to the Montana statute, although Montana's prohibition is broader in scope. That is, Montana's prohibition applies to every offense in which a defendant's mental state is at issue, while California's prohibition applies to a smaller subset of offenses (general intent crimes and implied malice murders). Nevertheless, both statutes reflect a legislative judgment that a

defendant's voluntary intoxication is not a defense to a certain designated group of offenses. Thus, under the Supreme Court's holding in *Egelhoff,* section 29.4 (b) does not violate a defendant's right to due process.

We are, of course, obligated to follow the United States Supreme Court's interpretations of constitutional law. (See *People v. Prince* (1996) 43 Cal.App.4th 1174, 1179.) Indeed, three different appellate courts, including this division, have previously applied the holding in *Egelhoff*, *supra*, 518 U.S. 37, in the context of an implied malice murder charge; none has found a due process violation. (*People v. Carlson* (2011) 200 Cal.App.4th 695, 707-708 [Fourth Appellate District, Division Three: prohibition against voluntary intoxication as a defense to implied malice murder did not violate due process]; *Timms*, *supra*, 151 Cal.App.4th at pp. 1298-1299 [First Appellate District, Division Four: same]; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1116-1117 [Fifth Appellate District: same].)

Wolfe argues that *Carlson*, *Timms*, and *Martin* were all "incorrectly decided" and that they misinterpreted *Egelhoff*, *supra*, 518 U.S. 37. We disagree. Further, Wolfe argues that our own state Supreme Court "has not determined whether application of Penal Code section 29.4 to exclude consideration of voluntary intoxication is an unconstitutional rule." We agree that the California Supreme Court has not *explicitly* ruled on the constitutionality of section 29.4 (b). However, the Court summarily rejected a due process challenge to a former version of the statute, section 22: "[W]e reject defendant's argument that the withholding of voluntary intoxication evidence to negate the mental state of arson [a general intent crime] violates his due process rights by denying him the opportunity to prove he did not possess the required mental state." (*People v. Atkins* (2001) 25 Cal.4th 76, 93, citing *Egelhoff*, *supra*, 518 U.S. at pp. 39-40, 56.) We are, of course, bound by the rulings of our state's highest court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

22

In sum, the trial court's instruction, which accurately informed the jury that voluntary intoxication is not a defense to a charge of implied malice murder, did not violate due process.

## III
## DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.

23