Filed 7/22/24  P. v. Verette CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL RAYMOND VERETTE,<br><br>        Defendant and Appellant. | A163868<br><br>(Contra Costa County<br>Super. Ct. No. 5-200819-1) |

A jury convicted appellant Michael Raymond Verette of two counts of murder for killing two motorists when he sped the wrong way onto the freeway in an attempt to evade police, and crashed head-on into the motorists' vehicle.  Verette argues that the jury should have been instructed on involuntary manslaughter and that the trial court wrongly allowed into evidence a statement he made after the accident.  We reject these arguments and affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

*A.     The Crash and the Events Leading Up to It.*

On the evening of December 16, 2019, Verette got together with a woman who was a close, longtime friend.  They met in a grocery store parking lot, and the friend got into Verette's sports utility vehicle.  They later drove to

1

a lookout point in El Sobrante, where they talked for around an hour, then had sex and used methamphetamine.[1]

Upon leaving the lookout point, Verette drove with his friend down Appian Way. The friend told Verette to slow down as they drove on wet pavement, but Verette drove quickly through a yellow light, and the friend was "kinda scared." Verette's friend was apprehensive about unsafe driving. Speeding, sudden jerks, and slamming brakes triggered a response "like PTSD" because she had been in an accident in 2014 that killed two of her children. A Pinole police officer who saw Verette driving though the yellow light estimated that Verette was driving around 60 miles per hour in a 35-miles-per-hour zone. Verette noticed the officer and said to his friend, "That was a cop right there, huh?" Verette then drove onto Interstate 80 heading east, and the officer followed him.

Verette's friend estimated they were going "[p]robably 100" miles per hour. At some point Verette said to his friend that "he couldn't go back to prison." At first, Verette's friend did not think the officer was following them. She told Verette to slow down and tried to convince him that no one was following them, but Verette kept saying that he did not want to go back to jail. Verette said that the car following them "had blue lights," meaning he believed a police car was behind them.

Verette got off the freeway at Pinole Valley Road, and then got back on the freeway heading west, the direction they had come from. While doing so, Verette ran a red light and caused another car to slam on its brakes. The officer following Verette had been around 200 yards behind them on the

---

[1] Verette's friend testified that Verette "tried to" snort methamphetamine but that he could not do it because "[i]t burns. He doesn't like it." The jury ultimately found Verette not guilty of driving a vehicle under the influence of a drug causing injury (Veh. Code, § 23153, subd. (f)).

freeway, but he was able to get closer when Verette got off the freeway. About this time, Verette's friend realized that they were, in fact, being followed, because she saw the police car behind them when they turned around. By that time, she had mentioned wanting to get out of the car. She testified, "[I] didn't want to die, I wanted to go see my boyfriend. I was done at high speeding. My brother lost his head," a reference to her brother being decapitated in a car accident. The officer continued to follow Verette. At some point, he informed radio dispatch that a vehicle had run red lights, and another Pinole police officer drove toward the area.

The officer following Verette first thought he would be able to initiate a traffic stop when Verette got off the freeway, but Verette got back onto the freeway too quickly for the officer to catch up. The officer followed Verette back onto the freeway heading westbound. Back on the freeway, Verette again drove "[p]robably 100 miles an hour," and Verette's friend told him not to speed away from the police. Verette continued to say that "he didn't want to go back to prison, he didn't want to get in trouble for anything. He had all this stuff in the car, and he didn't know what it was."[2]

While Verette was driving from Pinole Valley Road back toward the Appian Way exit, the officer following them thought he was not "going to catch" Verette's car. He planned to exit at Appian Way even if Verette continued on Interstate 80 because, as the officer later explained, "[I]t's a traffic violation and we have a no pursuit policy and I wasn't going to get into a chase over a traffic violation."

---

[2] This was a reference to items that Verette and his friend had picked up earlier in the evening from the home of the friend's mother, and that possibly included what could be considered burglary tools.

About this time, Verette's friend told Verette to pull over and "just let [her] out." She proposed that Verette "get off the freeway, and I was gonna jump." Her plan was to "[j]ump out of the moving vehicle in front of the police car," so that "[t]he cop would stop. They wouldn't follow him. [¶] You got a body flying out of a vehicle in front of you, you're a cop, you're gonna stop." Verette got off the freeway at Appian Way, with the officer following behind them. The officer notified dispatch that Verette was exiting at Appian Way. Verette was driving "much faster than" the officer. According to Verette's friend, they were on an overpass, and "[a]s soon as the cop hit his lights, I said, Slam on the brakes, I'm gonna jump. [¶] And then [Verette] slammed on the brakes, and then I jumped out." She jumped in the middle of the intersection onto the west side of the road as Verette's vehicle was "still skidding." At that point Verette's friend saw another police car coming toward them. An officer from that second car got out and told Verette's friend to get on the ground, where she was placed in handcuffs. She told an officer that both she and Verette knew there was a police car behind them, but she had told Verette there was no police car "because she didn't want to be in the car."

Meanwhile, Verette accelerated quicky over the overpass and drove between 75 to 81 miles per hour (above the 65-miles-per-hour limit) onto the offramp from eastbound Interstate 80 at Appian Way, leaving him driving westbound in the wrong direction. He soon crashed head on into a pickup truck, causing both vehicles to overturn. Two people were in the truck, and they died at the scene.

*B. Verette's Driving History.*

Verette has a history of dangerous driving and fleeing from police. In January 2011, an officer saw him holding a cell phone while driving a truck

4

in Hercules. When the officer tried to pull over Verette for the violation, Verette "rev[ved]" his engine and drove away quickly, without stopping at a stop sign. He drove over 60 miles per hour in a residential, 25-mile-per-hour zone, in an area where the road crested and it was difficult to see the entire roadway. After the officer followed Verette, Verette ran away from his truck and jumped over a house's fence, then jumped over multiple fences and ultimately hid under a truck and then in bushes near a driveway. During a post-arrest interview, Verette said his probation officer had told him he would "go back to jail" for any violations, including driving on a suspended license, and "he just didn't want to go back to jail."

On a different occasion, in July 2015, Verette drove alone in the carpool lane on westbound Interstate 80 near Gilman Street in Berkeley during heavy traffic. When a California Highway Patrol (CHP) officer tried to pull over Verette to issue a traffic citation, Verette moved to the shoulder and then drove onto an onramp going the wrong way at a high rate of speed. He drove to a parking lot near Golden Gate Fields and ran away before an Albany police officer was able to detain him.

On yet another occasion, in September 2017, Verette was caught speeding on a motorcycle in the early morning on Highway 4 near Interstate 80 in Hercules. He did not have his lights on and was going over 100 miles per hour. An officer caught up to Verette as he exited at Sycamore Avenue. When the officer initiated a traffic stop, Verette "accelerated heavily" through a stop sign, made a U-turn, then sped back onto Highway 4. Verette then exited after speeding around a mile and a half down the highway, and made another U-turn onto the highway coming back the same direction. At one point Verette drove more than 120 miles per hour. Eventually Verette got a flat tire, lost control of his motorcycle, crashed into a

guardrail, then ran down a hill and hid in a tree before officers took him into custody. Verette told the officer who had followed him that he (Verette) "fucked up and that he didn't want to catch a violation" of his post-community supervised release.

Verette's driver's license was suspended in December 2014 after he was found to be a negligent operator. His license was separately suspended in August 2015 for a period of four years. And his license was again suspended for six months in 2018, then again for six months in 2019 (through August 2020) for being a negligent operator. During a traffic stop in June 2019, a Hercules police officer learned that Verette's license was suspended. The officer cited Verette and formally notified him of the suspended license, as well as two additional suspensions that Verette was not aware of. Verette signed the form notification, and he was provided with a copy.

### C.     Trial Court Proceedings.

Verette was charged by felony information with two counts of murder (Pen. Code, § 187, subd. (a))[3] and other charges.

As discussed in more detail below, Verette's attorney requested that the trial court instruct the jury with CALCRIM No. 580, covering involuntary manslaughter, so that jurors could consider it as a lesser included offense. Although counsel acknowledged that current caselaw did not support giving the instruction, she contended that the inability to give the instruction violated Verette's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Citing caselaw rejecting Verette's position, the trial court declined to instruct the jury on involuntary manslaughter.

---

[3] All undesignated statutory references are to the Penal Code.

The jury found Verette guilty of two counts of murder (§ 187, subd. (a)); one count of reckless driving (Veh. Code, § 23103, subd. (a)), with a true finding that he caused great bodily injury (§ 12022.7, subd. (a)); and one misdemeanor count of driving while his license was suspended (Veh. Code, § 14601, subd. (a)). Following a court trial, the trial court found that Verette had suffered a prior reckless driving conviction (which was relevant to sentencing on the reckless driving count, Veh. Code, § 23104, subd. (b)), and that he also suffered a prior conviction that was both a serious felony conviction and a strike.

The trial court sentenced Verette to 15 years to life term on the first murder count, then doubled that term because of the strike, plus 15 years to life on the other murder count, for a total of 45 years to life.

## II.
### DISCUSSION

### A. *The Penal Code Barred the Trial Court from Instructing the Jury on Involuntary Manslaughter.*

Verette renews his argument that the trial court should have instructed the jury on involuntary manslaughter. He is mistaken.

As the jury was told, murder is the unlawful killing of another with malice aforethought, which may be express or implied. (§ 187, subd. (a); CALCRIM No. 520; *People v. Munoz* (2019) 31 Cal.App.5th 143, 152 (*Munoz*).) Jurors were further told that Verette acted with express malice if he unlawfully intended to kill. And jurors were also told that Verette acted with implied malice if he intentionally committed an act, the natural and probable consequences of which were dangerous to human life and he knew that to be the case, and he acted with conscious disregard for human life. (CALCRIM No. 520; see *Munoz* at p. 152.) The malice necessary for a murder conviction may be shown based on a defendant's conduct while driving a vehicle.

7

(*People v. Watson* (1981) 30 Cal.3d 290, 296 (*Watson*); § 192, subd. (e)(1) [codifying *Watson*].)

In general, " 'when a defendant is charged with a crime, the trial court must instruct the jury on any lesser included offenses that are supported by the evidence.' " (*Munoz, supra*, 31 Cal.App.5th at p. 153.) "Courts have 'applied two tests in determining whether an uncharged offense is necessarily included within a charged offense: the "elements" test and the "accusatory pleading" test. Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.' " (*Ibid.*, quoting *People v. Reed* (2006) 38 Cal.4th 1224, 1227–1228.)

Verette claims that the trial court should have instructed the jury on involuntary manslaughter, which is a lesser included offense of murder. (*Munoz, supra*, 31 Cal.App.5th at p. 153.) Involuntary manslaughter "is the unlawful killing of a human being without malice" that occurs "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."[4] (§ 192, subd. (b); see *Munoz* at p. 152.) Had this case not involved a vehicle, the trial court would have been obligated to instruct the jury on involuntary manslaughter if the evidence presented a material issue of whether Verette committed the killing without malice and there was substantial evidence that he committed involuntary manslaughter. (*Munoz* at pp. 153–154.) But the Penal Code

---

[4] Consistent with this definition is CALCRIM No. 580, which Verette's trial attorney requested be provided to the jury.

specifically provides that involuntary manslaughter "*shall not apply* to acts committed in the driving of a vehicle." (§ 192, subd. (b), italics added; *Munoz* at p. 152.) So where a killing involves the driving of a vehicle, the statute "*effectively eliminates involuntary manslaughter as a lesser included offense of murder.*" (*Munoz* at p. 154, italics added; see also *Watson*, *supra*, 30 Cal.3d at p. 297 [1941 amendment to Penal Code "*specifically made the involuntary manslaughter statute inapplicable to vehicular homicides*"], italics added.) Instead, a defendant may be charged with vehicular manslaughter (§ 192, subd. (c)), "which generally mirrors the language of the involuntary manslaughter provision but adds the element of 'driving a vehicle' and imposes different penalties depending on the level of negligence involved." (*Munoz* at p. 153.)

Verette acknowledges that section 192, subdivision (b), meant that he could not be formally *charged* with involuntary manslaughter. But he contends there is nothing in the statute that prevented the trial court from *instructing the jury* on involuntary manslaughter. This is a distinction without a difference. (See *People v. Gurule* (2002) 28 Cal.4th 557, 659 [trial court may refuse instruction if it is incorrect statement of law].) Under the plain meaning of section 192, subdivision (b), a trial court is *prohibited* from giving an involuntary manslaughter instruction where the driving of a vehicle is involved. (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 686 (*Wolfe*); see also *Munoz*, *supra*, 31 Cal.App.5th at p. 154.) Verette disagrees with the principle, accepted in *Munoz* and *Wolfe*, that the plain meaning of the statute precludes giving such an instruction. He instead contends that, despite the wording of the statute, "the Legislature never intended section 192, subdivision (b) to ban involuntary manslaughter instructions in vehicular murder cases."

9

In asking us to disregard the plain meaning of the statute, Verette relies on principles of statutory construction that are inapplicable here. True enough, "[o]ur fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.) But where examining the statutory language, giving the words their usual and ordinary meaning, reveals no ambiguity, "then we presume the lawmakers meant what they said, and the plain meaning of the language governs." (*Ibid.*) Verette asks the court to review the Legislature's treatment of vehicular homicide dating back to the 1940s.[5] But we look to legislative history and other extrinsic sources only where, unlike here, statutory terms are ambiguous. (*Ibid.*) Moreover, Verette relies mostly on statements made in 1945 by a district attorney in support of amendments to the statute, which are hardly dispositive on what the legislators who enacted the amendments intended.

Equally unhelpful for Verette is the principle "that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the Legislature did not intend." (*In re Michele D.* (2002) 29 Cal.4th 600, 606 [minor committed kidnapping when she took unresisting child even though traditional meaning of "force" was absent since Legislature meant kidnapping to reach that conduct]; see also *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 195–196 [construing ambiguous statute to mean that parent may be denied reunification services where a parent has already failed to reunify with same child, as opposed to a sibling, since Legislature may reasonably focus services on families most likely to be reunified].) Verette identifies no such "absurd" consequence of applying the

---

[5] Verette's unopposed request for judicial notice of the legislative history is granted.

plain meaning of section 192, subdivision (b)'s ban on involuntary manslaughter convictions in vehicular murder cases. He claims that if jurors are deprived of a "middle-ground" option where there is a reasonable doubt about the level of malice present, jurors will face "an all-or-nothing choice between convicting of an unproven murder charge or letting an obviously guilty defendant free," and opt for the murder conviction.[6] We agree with respondent that if a defendant is charged only with murder and the prosecution fails to prove implied malice, the result would be an acquittal as the result of the prosecutor electing to charge only murder—hardly an "absurd" result.

Verette relies on *People v. Sanchez* (2001) 24 Cal.4th 983, but his reliance is misplaced. *Sanchez* held that the offense of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)) is not a lesser included offense of murder (§ 187) since the greater offense (murder) may be committed without committing the lesser offense, which requires proof of additional and unique elements involving a vehicle. (*Sanchez* at pp. 985, 990–991.) The court acknowledged the state's "long-established tradition" that manslaughter is a lesser included offense of murder (*id.* at p. 989) but held that the tradition did not extend "to the more recently created crime[] of vehicular manslaughter while intoxicated" (*id.* at p. 990) since that new crime included an element (the use of a vehicle) not present for murder, the crime was not simply a degree of murder, "nor is it a crime with a lengthy pedigree as a lesser included offense within the crime of murder." (*Id.* at p. 991.) Verette says the same is not true of "more traditional forms of

---

[6] Jurors here were instructed that Verette was not guilty of murder "if he acted without the intent . . . required" for murder "but acted instead accidentally." (CALCRIM No. 3404.)

11

manslaughter" considering that manslaughter has been a lesser charge to murder "[s]ince the reign of Henry VII." (See *Mullaney v. Wilbur* (1975) 421 U.S. 684, 692–693 & fn. 13 [English rulers at the turn of the 16th century designated homicides committed without malice as "manslaughter"].) But section 192, subdivision (b), specifically overcomes this tradition in cases involving the driving of a vehicle. We reject Verette's argument that we should ignore the plain meaning of the statute.

Verette next argues that denying jury instructions on involuntary manslaughter in vehicular murder cases under section 192, subdivision (b), violates his rights to due process and equal protection under the Fourteenth Amendment. These arguments were raised, and rejected, in *Munoz* and *Wolfe*. (*Munoz*, *supra*, 31 Cal.App.5th at pp. 159–160, 162 [no due process violation since defendant did not have a fundamental right to involuntary manslaughter instruction and vehicular manslaughter statutes are reasonably related to proper legislative goal; no equal protection violation for similar reasons]; *Wolfe*, *supra*, 20 Cal.App.5th at pp. 684, 687–692 [same].) Verette essentially argues that *Munoz* and *Wolfe* were wrongly decided. But he points to no persuasive reasons for us to depart from their holdings.

Because we reject Verette's argument that he was legally entitled to jury instructions on involuntary manslaughter, we need not address his factual argument that there was substantial evidence to support giving instructions on involuntary manslaughter. (See *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1083 [trial court required to instruct on lesser included offenses that have substantial support in record].) We observe, however, that it was hardly beyond "reasonable dispute" that Verette would have been entitled to involuntary manslaughter instructions absent the statutory ban, as Verette argues. There was abundant evidence that he

12

stated repeatedly during his high-speed driving on the freeway that he did not want to return to prison and that both he and his friend were aware that a police officer was behind Verette's vehicle, undermining his appellate argument that there was evidence "he was not fleeing from the police." His speeding was consistent with past reckless driving, indicating he was aware of the risk of driving erratically.

The trial court did not err when it declined to instruct the jury on involuntary manslaughter.

### B. The Trial Court Did Not Err in Excluding Verette's Post-accident Statement of Remorse.

#### 1. Additional Background.

The prosecution filed a list of "general" motions in limine, one of which was "to exclude as irrelevant any testimony or statement from anyone concerning their own or the defendant's emotion of sympathy regarding the deaths of the victims." The trial court granted the unopposed motion.

At trial, the prosecutor questioned the CHP officer who responded to the crash and was assigned to be the lead investigator. The officer questioned Verette after he was removed from his vehicle as he was being prepared to be placed on a helicopter to be taken for medical care. The prosecutor asked, "Was [Verette] advised that people were deceased as a result of this collision?" The officer responded, "Yes, he was."

During cross-examination, Verette's counsel asked if the officer had asked Verette whether he was waiting for someone, and the officer responded that he did not recall. Counsel asked the officer if it would refresh his recollection to look at a transcript of the conversation taken from the officer's body camera. After the officer reviewed the transcript, he confirmed that he

13

remembered asking Verette whether he was waiting for someone. The following exchange then took place:

"Q. And after you were questioning him about where he was coming from, who he was with and what happened, you then—he was informed— Mr. Verette was informed that he had killed someone; correct?

"A. Yes.

"Q. And his response was, Oh, my God—"

The trial court then sustained an objection by the prosecutor, told the jury to disregard the question, and declined defense counsel's request to hold a sidebar.

Later, outside the presence of the jury, Verette's attorney argued that Verette's response was "very important" on the issue of "whether or not Mr. Verette had the requisite mental state of having an abandoned and malignant heart for implied malice." Counsel further argued that her question did not violate the ruling on the in limine motion that witnesses not be allowed to testify about Verette's emotion around the deaths of the victims since it went to his state of mind. After the parties argued this issue, the trial court stated it was not going to change its previous ruling.

2. Analysis.

Verette argues that the trial court abused its discretion and also violated his Sixth and Fourteenth Amendment right to present a defense when it excluded evidence of "his post-accident expression of remorse." (Bold omitted.) We are not persuaded.

Verette characterizes his statement as "key defense evidence" demonstrating "that he lacked the mental state required to commit implied malice murder." We do not see it the same way. It may be true, as Verette argues, that the *absence* of remorse may be relevant to prove the degree of

14

homicide since "it sheds light on the defendant's mental state." (*People v. Michaels* (2002) 28 Cal.4th 486, 528.) But it does not necessarily follow, as Verette contends, that a statement of remorse is similarly relevant. As respondent notes, whatever remorse Verette might have felt *after* the deaths sheds little light on his mental state when he drove at a high rate of speed in the dark the wrong way onto the freeway. (See *People v. Pearson* (2013) 56 Cal.4th 393, 460–461 [defendant failed to show that expressions of remorse during police interview were relevant to state of mind at time of murders].) Verette's reliance on cases focusing on the lack of remorse are thus inapposite. While we cannot say that a showing of remorse could never be considered relevant, Verette falls far short of explaining why his statement would be relevant here. Because the statement did not prevent Verette from presenting a complete defense, his constitutional rights were not implicated, as he contends. (Cf. *Crane v. Kentucky* (1986) 476 U.S. 683, 690; see *People v. Babbitt* (1988) 45 Cal.3d 660, 684 [defendant does not have " 'constitutional right to present all relevant evidence in his favor, no matter how limited in probative value' "].)

Even if the trial court somehow erred in excluding Verette's statement, the error was harmless since there is no reasonable probability that a result favorable to him would have been reached absent the alleged error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Again, there was abundant evidence that Verette was aware of the danger posed by his high-speed driving and that he nonetheless acted with conscious disregard for human life. Any post-accident statement of remorse does not negate that.

Finally, because we have rejected Verette's arguments, we also reject his argument that he was cumulatively prejudiced by them.

### III.
### DISPOSITION

Verette's amended request for judicial notice filed on July 26, 2023, is granted.

The judgment is affirmed.

_____

Humes, P.J.




WE CONCUR:




_____

Langhorne Wilson, J.




_____

Siggins, J.*




*Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Verette*  A163868