Filed 1/30/23  P. v. Garcia CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT GARCIA, JR.,<br><br>    Defendant and Appellant. | D080080<br><br><br><br>(Super. Ct. No. INF1700208) |

APPEAL from a judgment of the Superior Court of Riverside County, Dale R. Wells, Judge.  Remanded for resentencing.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Andrew Mestman and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Robert Garcia, Jr. drove two passengers to Palm Springs in his sedan after smoking methamphetamine.  He made a left turn as the light was changing, ignoring his passengers' pleas to stop.  An oncoming vehicle crashed into his sedan as he turned, killing his front seat passenger.  Garcia was unharmed, but his backseat passenger and the occupants of the oncoming vehicle sustained injuries.  Based on these events, a jury convicted Garcia of second degree murder (Pen. Code, § 187, subd. (a)) and driving under the influence causing bodily injury.[1]  Rejecting his request for probation, the court sentenced him to concurrent prison terms of seven years and 15 years to life.

On appeal Garcia contends the court violated Evidence Code section 352 in permitting the People to introduce prior act evidence from the 1980s to show implied malice.  He argues this evidence was remote as well as cumulative where a later 2011 conviction and *Watson* advisement came in.  Because the evidence of implied malice was overwhelming, we reject this claim, finding any evidentiary error harmless.  Garcia next asks us to revisit the *Watson* murder doctrine, a request we readily reject in our role as an intermediate appellate court.  Finally, Garcia raises two challenges pertaining to his sentence.  We conclude that recent amendments to the Determinate Sentencing Law (DSL) (§ 1170, subd. (b)) made by Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5.3, effect. Jan. 1, 2022) require remand for resentencing so that the trial court can consider whether to impose a presumptive lower term on count 2.  Garcia can direct his request for a

---

[1]     Implied malice murder involving drunk driving is colloquially "known as a *Watson* murder" (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 677 (*Wolfe*)), based on the Supreme Court's opinion in *People v. Watson* (1981) 30 Cal.3d 290, 301 (*Watson*).

Further undesignated statutory references are to the Penal Code.

diagnostic report under section 1203.03 to the trial court in the first instance. Accordingly, we remand for resentencing and in all other respects affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On January 29, 2017, Garcia stayed up all night smoking methamphetamine with his friend T.O. Garcia was a daily methamphetamine user and the two would regularly smoke together. The next morning, Cesar Z. and Keyon P. came to T.O.'s home and asked Garcia if he could drive them to Home Depot in Palm Springs to return a garbage disposal. The group smoked methamphetamine together and got high. Garcia then got behind the wheel of his Ford Taurus sedan, with Keyon in the front passenger seat and Cesar in the backseat behind Keyon. T.O. did not join the trio but described Garcia as behaving "normal like he always is" when he got behind the wheel.

As Garcia approached Palm Springs on Route 62, he swerved or drifted out of his lane two or three times. Cesar asked if he was feeling okay and offered to drive. Garcia refused, saying no one else could drive his car. In Palm Springs, Garcia got lost trying to locate Home Depot. Ignoring Cesar and Keyon's directions, he missed a turn as he was driving south on North Sunrise Way. Approaching the next intersection—East Amado Rd.—Garcia failed to slow down at a yellow or red light and proceeded at full speed to turn left in front of oncoming traffic. Keyon and Cesar yelled at Garcia to stop, asking, "What's wrong with you?" and exclaiming, "[Y]ou're gonna get hit by the car." Although the light was yellow or red, Garcia "still wasn't stopping . . . [or] even showing signs of slowing down."

At that moment, Michael E. was approaching the intersection traveling north on North Sunrise Way. He was driving a GMC Yukon sports utility

3

vehicle with Michael D. in the front passenger seat. Seeing the light turn green, he accelerated toward the intersection. He did not see Garcia's sedan turn left until it was too late. The Yukon smashed into the Taurus's front passenger door, killing Keyon. Cesar's leg got caught as he tried leaping toward the driver's side of the backseat seconds before the collision. As the parties would stipulate at trial, Keyon died of multiple blunt force traumatic injuries from the collision, Cesar suffered great bodily injury, and Michael E. and Michael D. each suffered bodily injuries.

Responding officers spoke to Garcia, observed signs of impairment, and conducted field sobriety tests. Garcia had droopy eyelids and constricted pupils. He performed poorly on the walk-and-turn test and finger-to-nose test, leading officers to conclude he was under the influence and could not safely operate a vehicle. A more detailed evaluation by a drug recognition expert in a controlled setting at the police station confirmed these findings. Garcia's eyelid tremors suggested stimulant use, and he had slow, slurred speech. Garcia claimed to have taken Tramadol and smoked marijuana that day. He knew he was not supposed to drive after consuming either substance. As he told Palm Springs Patrol Sergeant Kevin Lu, driving under the influence of those substances could affect his senses and response time, resulting in possible collision and death.

A search warrant was issued for a blood sample, which indicated 102 nanograms per milliliter of methamphetamine and 27 nanograms per milliliter of amphetamine, a metabolite, in Garcia's system. Although methamphetamine is a stimulant that causes hyperactivity, during the crash phase a user experiences slowness in movement and speech and exhibits balance and coordination issues. Some stimulant effects of methamphetamine such as eyelid tremors may still be present during the

4

crash phase. Officers initially suspected that Garcia was under the influence of a narcotic analgesic, like the Tramadol he claimed to be taking, but lab results led them to conclude he was instead experiencing the downside effects of methamphetamine use.

The Riverside County District Attorney charged Garcia by information with second degree murder of Keyon (§ 187, subd. (a), count 1) and driving under the influence causing bodily injury (Veh. Code, § 23153, subd. (f), count 2).[2] As to count 2, it was alleged that Garcia personally inflicted great bodily injury on Cesar (Pen. Code, §12022.7, subd. (a)) and proximately caused bodily injury to Michael E. and Michael D. (Veh. Code, § 23558).[3] The jury convicted Garcia as charged and found all allegations true. The court sentenced him to an indeterminate term of 15 years to life on count 1. On count 2, it imposed a concurrent determinate sentence of seven years, consisting of the two-year middle term for driving under the influence (§ 1170, subd. (h)), three years for the great bodily injury enhancement, and two one-year terms for each bodily injury enhancement.

---

[2]     As Garcia notes on appeal, the information incorrectly cited subdivision (e) rather than subdivision (f) of Vehicle Code section 23153. Vehicle Code section 23153, subdivision (f) prohibits any person while under the influence of any drug to drive negligently, causing bodily injury to any person other than the driver.

[3]     Section 12022.7, subdivision (a) adds a three-year consecutive prison term for "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony . . . ." Where properly pleaded and proven, the one-year enhancement attaches to a "person who proximately causes bodily injury or death to more than one victim in any one instance of driving in violation of Section 23153 of [the Vehicle Code]." (Veh. Code, § 23558.)

DISCUSSION

On appeal, Garcia urges us to find evidentiary error and revisit the *Watson* murder doctrine of implied malice. We reject both contentions. But we accept his claim that recent amendments to the DSL require remand for resentencing, where the effects of his 1993 traumatic brain injury can be more fully considered.

A.  *Any error in admitting remote or cumulative DUI cases from the 1980s was harmless.*

Garcia challenges as remote and cumulative evidence of past driving-under-the-influence (DUI) arrests from the 1980s, which the prosecution introduced to establish implied malice. As we explain, even assuming the court erred in admitting one or more of these prior acts, there is no reasonable probability it affected the outcome where evidence of implied malice was overwhelming.

1.  *Additional Background*

Before trial, the People filed a motion in limine to admit evidence that Garcia had four prior law enforcement contacts relating to DUIs. Three incidents took place in the 1980s, while a fourth happened in 2010. The prosecution maintained that this evidence was admissible under Evidence Code section 1101, subdivision (b) to prove Garcia had the requisite knowledge that the natural consequences of his impaired driving were dangerous to human life.

Defense counsel moved to exclude the 1980s incidents under Evidence Code section 352. While Garcia was advised in pleading guilty in 2011 about the dangers of impaired driving, counsel maintained there was no nonspeculative way to determine what he had learned from decades-old incidents (particularly the one resulting in *acquittal*). To the extent the court

6

was inclined to admit this evidence, counsel sought to introduce it by stipulation to minimize its prejudicial effect. The People agreed to introduce this prior act evidence by stipulation. Ultimately the court ruled that the prosecution could introduce by stipulation evidence of all four of Garcia's past DUI incidents to show that he possessed the requisite mental state for *Watson* murder.

Midway through trial, several stipulations were read to the jury. In 1986, Garcia was acquitted of driving while intoxicated in North Carolina, but he received a reprimand from his military commanding officer. In 1987, he was again charged but this time convicted of driving while intoxicated in North Carolina, reprimanded by his commanding officer, and ordered to enroll in drug and alcohol traffic school. Garcia received a second conviction in 1989, this time arising out of a DUI hit-and-run accident that caused injury in Santa Barbara. Finally, Garcia was convicted of a DUI in 2011, placed on probation, and ordered to attend a three-month drinking and driving education program. He acknowledged in a written statement that " ' "being under the influence of alcohol or drugs or both, impairs my ability to safely operate a motor vehicle." ' " By initialing, Garcia said he understood that " ' "it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both" ' " and that continuing " ' "to drive while under the influence of alcohol or drugs or both" ' " could result in murder charges if " ' "as a result of that driving someone is killed." ' "

The prosecutor highlighted the 2011 *Watson* advisement during her closing argument, stating Garcia knew in initialing this statement after his fourth DUI arrest that driving under the influence was extremely dangerous to human life. Nevertheless, he consciously disregarded that risk by staying up all night doing methamphetamine and getting behind the wheel. He

7

further ignored the known risk to human life in refusing Cesar's offer to drive as he swerved and drifted across lanes, and in ignoring pleas from his passengers to stop rather than turn left as the traffic light changed color. Given Garcia's past driving history—in particular, the hit-and-run in 1989 and the *Watson* advisement he initialed in 2011—the prosecutor argued that Garcia knew the consequences of impaired driving. Garcia admitted as much to the responding officer, saying he knew well enough not to drive under the influence of marijuana and Tramadol, which by extension suggested he knew not to drive under the influence of methamphetamine.

Defense counsel, by contrast, argued to the jury that Garcia did not swerve or drive erratically until getting lost in Palm Springs. In the defense's view, Garcia's mannerisms in speaking with responding law enforcement officers did not suggest he was on the downside of a methamphetamine high. Looking to the totality of the circumstances, counsel suggested there was evidence Garcia suffered a prior traumatic brain injury and could not remember what happened back in 2011. Counsel asked: "Has the prosecution proven beyond a reasonable doubt that that unfortunate left turn on the yellow was due to impairment? Is it reasonable based on the state of the evidence that that could have been due to his head injury previously in 1993? If you don't know the answer to that, that's reasonable doubt."

In rebuttal, the prosecutor remarked that this case was not about " '[a]n unfortunate left turn' " but rather about "a man who was arrested for driving under the influence for the fifth time after he was explicitly told not to do this." Despite Garcia's history of being in a collision while under the influence and receiving an explicit *Watson* advisement, she maintained that Garcia refused to take responsibility for what he knew in getting behind the

8

wheel. She reminded jurors to not "forget this is his [fifth] time he's been arrested for DUI." "The defendant has been told over and over again that he can't do this. But he still chooses to drive while under the influence. He knows the risks. He told Sergeant Lu all about them." "He'd been in a collision while driving under the influence before he'd spent time in jail. Taken at least three DUI education courses and then we've got that written admonishment. He knew what he was doing. He knew the risk he was creating, and he just didn't care." Indeed Garcia "chose to stay behind the wheel when someone else offered to drive." As to Garcia's 1993 head injury, the prosecutor noted that the injury did not stop him from being convicted in 2011 of another DUI.

The jury was given a limiting instruction that it could consider the prior DUIs if proven by a preponderance of the evidence solely to decide whether Garcia "knew that driving under the influence of drugs or alcohol or both is dangerous to human life" or to conclude that his "alleged actions were not the result of mistake or accident." (CALCRIM No. 375.) The court directed the jury not to consider the prior act evidence for any other purpose. (*Ibid.*)

### 2. *Applicable Legal Principles*

As a rule, prior act evidence is admissible where it is relevant to prove some fact other than propensity, "such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." (Evid. Code, § 1101, subds. (a)–(b).) Garcia was charged with *Watson* murder, which rests on a theory of implied malice. (*Watson, supra,* 30 Cal.3d at pp. 300–301; Pen. Code, §§ 187, 188; see CALCRIM No. 520.) " 'Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with

9

conscious disregard for that danger.' " (*Wolfe, supra,* 20 Cal.App.5th at p. 681.) Unlike gross negligence, implied malice "depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*Watson,* at pp. 296−297.) As one court put it, "the state of mind of a person who acts with conscious disregard for life [i.e., implied malice] is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' The state of mind of the person who acts with conscious indifferences to the consequences [i.e., gross negligence] is simply, 'I don't care what happens.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987−988 (*Olivas*).)

Although implied malice requires *actual* awareness of the risk created, it does not require proof "by an admission or other direct evidence of the defendant's mental state." (*People v. Superior Court* (*Costa*) (2010) 183 Cal.App.4th 690, 697.) "[L]ike all other elements of a crime, implied malice may be proven by circumstantial evidence." (*Ibid.*) Past DUI convictions, courses, and advisements have been admitted for this purpose. (See *Wolfe, supra,* 20 Cal.App.5th at pp. 677, 683 [20-year-old prior conviction for DUI followed by impaired driving class, as well as five-year-old attestation during license renewal].) Circumstantial evidence of implied malice may also be found from the nature of the incident itself. (*Id.* at pp. 683−684 [inability to stay in her lane, flight from the scene, and circumstances of the collision]; *Olivas, supra,* 172 Cal.App.3d at pp. 987−988 [speeding, collision with one car and near misses with two others, and deliberate avoidance of pursuing officers]; *Watson, supra,* 30 Cal.3d at p. 301 [speeding, running a red light, and near miss with another vehicle before colliding with the victim's car].)

"Regardless of its probative value, evidence relating to other crimes always creates a risk of serious prejudice." (*People v. Brogna* (1988) 202

10

Cal.App.3d 700, 709.) Under Evidence Code section 352, the court may exclude prior act evidence if its prejudicial effect substantially outweighs the probative value. (*Ibid.*) Prior act evidence is unduly prejudicial where it uniquely tends to evoke an emotional bias against the defendant or causes the jury to prejudge the defendant on extraneous factors. (*People v. Foster* (2010) 50 Cal.4th 1301, 1331.) We review a trial court's evidentiary rulings under Evidence Code sections 1101 and 352 for abuse of discretion. (*Id.* at p. 1328.) Any error is harmless if there is no reasonable likelihood that it affected the outcome. (See *People v. Thomas* (2011) 52 Cal.4th 336, 356, fn. 20 (*Thomas*) [applying the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 to rulings under Evidence Code section 1101].)

3.     *Analysis*

Garcia argues that the decades-old DUI incidents from the 1980s should have been excluded under Evidence Code section 352. (See *People v. Harris* (1998) 60 Cal.App.4th 727, 739 [remoteness of 23-year-old prior conviction weighed toward exclusion].) While acknowledging that there is no clear time cutoff for remoteness (see *ibid.*), he notes that prior act evidence admissible to show propensity under Evidence Code section 1109 must be less than 10 years old. (Evid. Code, § 1109, subd. (e).) While a high degree of similarity between incidents may balance out remoteness concerns (see *People v. Hernandez* (2011) 200 Cal.App.4th 953, 968), Garcia notes that his prior DUIs all involved alcohol, not methamphetamine. The People respond that remoteness of prior act evidence generally affects weight, not admissibility. (*People v. Caitlin* (2001) 26 Cal.4th 81, 127.) They further suggest that a remoteness argument in introducing decades-old convictions is undermined by Garcia's failure to lead a blameless life thereafter given his conviction in 2011. (See *Harris*, at p. 739.)

11

Beyond remoteness, Garcia deems the 1980s evidence cumulative given ample other evidence demonstrating his knowledge that impaired driving was dangerous to life. Defense counsel conceded that the 2011 DUI conviction and *Watson* advisement was relevant and admissible to prove Garcia's mental state. The jury additionally heard Garcia's statements to officers after his arrest. The People by contrast suggest that the admission of other evidence tending to show Garcia's mental state did not alone render the 1980s evidence cumulative. Moreover, where the evidence was presented to the jury in the form of a stipulation, it "did not consume much time and was no more inflammatory than the other evidence presented at trial."

Garcia questions how a 1986 *acquittal* of driving under the influence was probative of his mental state decades later. To this, the People cite *People v. Garcia* (1995) 41 Cal.App.4th 1832, which at page 1849 found no abuse of discretion in admitting evidence of three prior DUI arrests where only one led to conviction.

As we explain, we need not decide whether admitting evidence of Garcia's three prior DUI arrests from the 1980s was an abuse of discretion under Evidence Code section 352. Assuming the court erred in failing to exclude one or more of these prior acts, the error was harmless.

The main question at trial was whether Garcia possessed the requisite knowledge that driving under the influence of drugs was dangerous to human life as he got behind the wheel, and if he consciously disregarded that risk. Blood tests revealed methamphetamine in Garcia's system, and trial testimony confirmed that Garcia was a daily user who had smoked the morning of the collision and the night before. The defense did not challenge the admission of his 2011 DUI conviction, or the *Watson* advisement that spoke directly to his knowledge that driving under the influence of drugs or

alcohol was extremely dangerous to human life. As Garcia approached Palm Springs on Route 62, he drifted out of his lane two or three times, causing Cesar to offer to drive. Ignoring his passengers' pleas to stop, Garcia ploughed through a yellow or red light without breaking to turn left. After the crash, Garcia told responding law enforcement that he knew driving under the influence of marijuana or Tramadol could affect his senses and response time and result in a collision or death.

Simply put, the strongest evidence of malice came from the 2011 *Watson* advisement, his driving behavior and postaccident admissions that day, and his response to Cesar and Keyon's pleas—evidence to which no admissibility challenge is raised. Prior act evidence was offered by stipulation to minimize its prejudicial effect. Although the prosecutor repeatedly highlighted Garcia's multiple DUI priors during her closing argument, she tied this evidence to the question of whether he acted with implied malice, and the jury was given an appropriate limiting instruction. On this record, we are persuaded that despite the remoteness or cumulativeness concerns raised by Garcia, there is no reasonable likelihood he would have obtained a more favorable outcome had the 1980s DUI evidence been excluded from trial.

B. *We Cannot Reconsider* Watson.

Maintaining we are " 'bound but not gagged' " by California Supreme Court precedent, Garcia urges us to reconsider the *Watson* murder doctrine of implied malice, suggesting that impaired drivers should instead face punishment for gross vehicular manslaughter while intoxicated. As an intermediate appellate court, we need not dwell on this argument. The Supreme Court's 1981 ruling in *Watson* remains binding precedent, and

13

Garcia offers no reasoned basis to depart from it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## C.  *Resentencing Is Required*

Evidence at trial and sentencing suggested Garcia suffered a traumatic brain injury in 1993 that may have contributed to the collision. When he was sentenced in November 2021, the court had no basis to take this evidence into account when it imposed the middle term on count 2. Because recent amendments to the DSL enacted as part of Assembly Bill No. 124 may make lower term sentencing presumptive on our record, resentencing is required.

### 1.  *Additional Background*

A central issue at trial was whether Garcia acted with implied malice when he drove a vehicle while he was under the influence of a controlled substance. Soon after the collision, Garcia told responding officers that he suffered a brain injury in 1993. He said his brain injury made it challenging to process information. Cesar felt that on the day of the accident, Garcia was acting like a "space cadet"—he seemed to listen one moment but not be present in the next. Relying on this evidence, defense counsel asserted in closing that Garcia was "a space cadet" who, because of his brain injury, could not recall the 2011 *Watson* advisement. He suggested the brain injury created reasonable doubt whether Garcia failed to stop due to his 1993 head injury rather than the influence of methamphetamine. In her rebuttal, the prosecutor claimed law enforcement ruled out the possibility that a head injury affected the results of Garcia's sobriety tests. She added that Garcia got his license back after the head injury, continued driving for 20 years, and was convicted of a DUI in the interim in 2011.

After the jury convicted him, Garcia requested formal probation in his sentencing brief. He reported experiencing a traumatic brain injury in 1993

14

after a car accident. (Garcia was the unbelted passenger in a pickup truck being driven by his father on a dirt road; his father lost control and crashed into a tree.) Doctors had to perform an emergency craniotomy, and Garcia lost significant cognitive functioning. Medical records from 1993 and 2007 confirmed residual cognitive effects. The People opposed Garcia's request for probation, claiming he was not a suitable candidate notwithstanding a 28-year-old injury. To the extent Garcia still experienced cognitive deficits from the 1993 collision, the People argued that the incident enhanced rather than negated his dangerousness because he should not have been driving at all.

At the start of the sentencing hearing, the court indicated its tentative decision to deny probation and impose a determinate prison term of seven years on the DUI count to be served concurrently with an indeterminate 15-years-to-life term on the murder count. Invited to comment, defense counsel reiterated his request for probation in light of Garcia's brain injury. If probation were denied, counsel urged the court to impose only the determinate term on count 2 and stay the sentence on count 1 based on amendments due to take effect.[4] He further asked the court for a 90-day

---

[4] Effective January 1, 2022, Assembly Bill No. 518 amended section 654 to permit the court to stay execution of *either* term, whereas before the statute required the court to stay the shorter sentence. (See generally, *People v. Jones* (2022) 79 Cal.App.5th 37, 45.) Garcia was sentenced two months before the amendments took effect. The court concluded that section 654 did not apply, imposed sentences on both counts, and ran the terms on counts 1 and 2 concurrently. Garcia does not challenge that ruling on appeal.

15

diagnostic pursuant to section 1203.03 that could be considered in recalling the sentence.[5]

Garcia's sister Elida S. then spoke. She indicated that Garcia's traumatic brain injury left him "with the functioning capability of a seven-year-old," a fact not considered during trial. Nor, in her view, "was his mental status taken into consideration." She asked for probation so that the family could help Garcia receive mental health therapy and assured the court that he would not be permitted to drive.

The prosecutor urged the court to find Garcia unsuitable for probation. She highlighted his failure to take responsibility or show remorse for his actions. She further noted that Garcia had served past probationary terms and completed education components but nevertheless drove while impaired and killed someone. As to the request for a diagnostic evaluation, the prosecutor remarked that this should have been requested before sentencing. While a diagnostic report would offer additional information on Garcia's cognitive functioning, the prosecutor did not feel it would be material. The court already had extensive information about Garcia's cognitive deficiencies following the 1993 accident. To the extent the court credited the family's

---

[5]     Where a defendant faces confinement in state prison and a court concludes "that a just disposition of the case" requires diagnosis and treatment services, the court "may order that defendant be placed temporarily in such facility for a period not to exceed 90 days" for the Department of Corrections diagnose his mental state and submit recommendations in a written report. (§ 1203.03, subds. (a)−(b).) Time spent in a diagnostic facility is credited against the defendant's sentence. (*Id.*, subd. (g).) If during the diagnostic period defendant is found "to be suffering from a remediable condition relevant to his criminal conduct, the department may, with the permission of defendant, administer treatment for such condition." (*Id.*, subd. (h).)

account of lasting repercussions, she felt that made his conduct more egregious, not less, in driving while under the influence.

Defense counsel responded that Garcia's apparent failure to show remorse or accept responsibility should be construed in light of his immaturity, which was caused by his brain injury. Garcia was not a callous person who sought to inflict pain, and his actions and statements were "a result of his injury."

Judge Wells ruled that while there was no bar to granting probation, he did not believe Garcia was a suitable candidate. He wished he had "more current information about his mental state," noting the 2007 neuropsychological report was 14 years old. Given its age, he could not rely on the report to determine Garcia's probation-eligibility. The court accepted defense counsel's reason for Garcia's "apparently callous remarks." Nevertheless, past opportunities to learn about impaired driving did not prevent him from killing someone. As sympathetic as the court was to the family, it did not believe probation would be responsible or proper.

The court then listed reasons for and against probation. Garcia did not have an extensive criminal record and had performed satisfactorily on probation or parole in the past. He was not currently on probation or parole and had the ability and willingness to comply with reasonable conditions of probation. The adverse collateral consequences of a prison term would be serious. On the other hand, the court considered the serious nature of the offense and circumstances of the crime. The victim was vulnerable, and Garcia abused his position of trust or confidence, ignoring his passengers' pleas to stop. On balance, even if Garcia was technically eligible for probation, the court did not believe he was a suitable candidate for it.

17

In selecting a prison term, the court imposed a 15-years-to-life indeterminate term on count 1. Count 2 was punishable by 16 months, two years, or three years. (§ 1170, subd. (h).) Based on the aggravating and mitigating factors, the court imposed a two-year middle term. To this, it added a three-year great bodily injury enhancement as to Cesar and two one-year bodily injury enhancements as to Michael E. and Michael D. The court commented that it was showing leniency by running the terms on counts 1 and 2 concurrently rather than consecutively. Turning to Garcia's request for a 90-day diagnostic, Judge Wells expressed that section 1203.03 envisioned any diagnostic study being completed before sentencing and denied Garcia's request.[6]

    2.    *Assembly Bill No. 124*

Assembly Bill No. 124 amended the DSL to make lower term sentencing presumptive under certain circumstances. (Stats. 2021, ch. 695,

---

[6] Section 1203.03 indeed envisions any diagnostic study to be completed before sentencing. (See § 1170, subd. (b)(4) [listing "reports received pursuant to Section 1203.03" among the materials a court may consider during sentencing].) Even so, Garcia argues that nothing prohibited a request being made *at* the sentencing hearing, with the court free to postpone the hearing or recall the sentence after his evaluation. Claiming the trial court abused its discretion in denying his request, he seeks remand with directions that the trial court order a diagnostic study before resentencing. Because we conclude remand for a full resentencing hearing is necessary based on recent amendments to the DSL, we need not address this issue. We presume a request for a diagnostic study under section 1203.03 will be made well before resentencing, and any remaining argument about the propriety of such a study can be directed to the trial court.

§ 5.3.)[7]  As relevant here, lower term sentencing is presumptively appropriate where a defendant "has experienced psychological, physical, or childhood trauma" and that trauma "was a contributing factor in the commission of the offense."  (§ 1170, subd. (b)(6)(A); see Cal. Rules of Court, rule 4.420(e)(1).)  Where the presumption applies, the court must apply the lower term unless it "finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice."  (§ 1170, subd. (b)(6).)

As the People appropriately concede, this amendment applies retroactively to Garcia.  (*In re Estrada* (1965) 63 Cal.2d 740, 745; see *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1095 (*Gerson*).)  Nevertheless, they suggest that remand for resentencing is unnecessary because the court's statements at sentencing demonstrate it would have found a lower term on count 2 "contrary to the interests of justice."  The People support this claim by pointing to the aggravating and mitigating factors justifying a denial of probation.  Separately, the People suggest that the court was aware of Garcia's 1993 brain injury, but was not presented with sufficient evidence that the trauma "was a contributing factor in the commission of the offense." (§ 1170, subd. (b)(6).)

---

[7]  The Legislature passed two bills amending the DSL in the same session.  Garcia mistakenly refers to Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3), but that bill amended the DSL by making the middle term in a sentencing triad the presumptive choice unless aggravating circumstances stipulated to by the defendant or found true beyond a reasonable doubt by the jury "justify" imposition of a higher term.  (§ 1170, subd. (b)(1)−(b)(3).)  Garcia instead relies on the changes made by Assembly Bill No. 124, which added subdivision (b)(6) to the statute to make the *lower term* presumptive where certain conditions are met.

19

Contrary to the People's argument, there is no indication—much less a clear one—that the court would have imposed the same middle term on count 2 had Assembly Bill No. 124 been in effect at sentencing. (See *Gerson, supra,* 80 Cal.App.5th at p. 1096.) In requesting probation, Garcia submitted medical records from 1993 and 2007 pertaining to his traumatic brain injury. The probation report indicated that Garcia's 1993 accident left him in a coma for 21 days with severe brain damage; "it took him about 5 years to recover, but he was never able to fully recover" and felt lingering physical and mental effects. Garcia's sister suggested the brain injury contributed to the current offense.

Before Assembly Bill No. 124, Garcia had no reason to seek, and the court had no reason to make, a finding that past trauma contributed to his offense—there was no statutory basis to apply a lower term based on such a finding. (*Gerson, supra,* 80 Cal.App.5th at p. 1096.) Judge Wells's wish for "more current information about [Garcia's] mental state" and his desire to show "leniency" by running the two counts concurrently suggest that a remand for resentencing would not necessarily result in the same outcome. (See *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)

Accordingly, we vacate Garcia's sentence and remand the matter for a full resentencing hearing. (*People v. Buycks* (2018) 5 Cal.5th 857, 893; *Gerson, supra,* 80 Cal.App.5th at p. 1096.) Any request for a diagnostic study pursuant to section 1203.03 may be directed to the trial court in the first instance.

## DISPOSITION

This matter is remanded for resentencing consistent with Penal Code section 1170, subdivision (b) as amended.  Following resentencing, the court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.


                                                           DATO, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.

21