Filed 10/27/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOSE HARO NEVAREZ, | D085897 |
| Petitioner, | |
| v. | (San Diego County Super. Ct. No. SCD301522) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING in prohibition. Laura Parsky, Judge. Petition denied.

Jo E. Super, Chief Deputy Public Defender and Ryan M. Ahern, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Summer Stephan, District Attorney, Dwaine Woodley, Assistant District Attorney, Linh Lam, Valerie Ryan, Emmaline Campbell and Carrie Johnson, Deputy District Attorneys, for Real Party in Interest.

Jose Haro Nevarez was driving while intoxicated when he caused a collision on Interstate-15 that resulted in the death of a motorcyclist. The motorcyclist struck Nevarez's SUV minutes after it was rendered disabled on the freeway. Thereafter, Nevarez was charged with second-degree murder (Pen. Code, § 187, subd. (a)),[1] among other crimes. After a magistrate found probable cause to support the charges, Nevarez's defense counsel filed a motion under section 995 to set aside the murder charge. Nevarez argued that under this court's decision in *People v. Superior Court* (*Chagolla*) (2024) 102 Cal.App.5th 499 (*Chagolla*), the murder charge could not proceed because his vehicle was inoperable at the time it was struck by the victim's motorcycle.

The trial court denied the motion, finding *Chagolla* distinguishable. Nevarez then filed a petition for writ of prohibition asking this court to overturn the trial court's order and we issued an order to show cause. As we shall explain, we agree with the trial court that probable cause supports the murder charge and deny Nevarez's petition. We also accept the parties' invitation to clarify our decision in *Chagolla* and hold that liability for murder under the Supreme Court's decision in *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*) does not automatically end the moment an intoxicated driver ceases driving.

FACTUAL AND PROCEDURAL BACKGROUND

On December 1, 2023, around 9:54 p.m., Nevarez was driving a Honda Pilot southbound on Interstate-15 (I-15). Witnesses testified at the preliminary hearing that before the collision Nevarez was driving between 90

---

[1] Subsequent undesignated statutory references are to the Penal Code.

2

to 100 miles per hour in a 65-mile-per-hour zone. In the area of the crash, there were five general lanes of traffic and two high-occupancy vehicle (HOV) lanes. Nevarez was in the farthest left general lane (the number one lane) and crashed into the rear of a Honda Odyssey in front of him, causing the Odyssey to spin clockwise to the right and fly across all five general lanes of traffic. As the Odyssey spun, it struck a Ford box truck that was traveling in the number four lane. The impact sent the box truck and the Odyssey to the right shoulder of the freeway. After it hit the Odyssey, Nevarez's Pilot side-swiped an Audi A7 sedan in the far left general lane. The Pilot then veered left across the two HOV lanes and came to a stop against the concrete barrier wall, blocking the number one HOV lane. At that point, the Pilot was disabled and all of its lights were off.

At the same time, motorcyclist Robert Cole Sutton was traveling south in the number one HOV lane. Sutton had a motorcycle permit and was not speeding. Moments after Nevarez struck the Odyssey, as the Odyssey's driver was on the phone with 911, Sutton struck the right rear of Nevarez's Pilot. The force of the collision detached Sutton's left leg from his body, and he was thrown approximately 200 feet down the road in front of the Pilot. First responders pronounced Sutton deceased at 10:39 p.m.

Moments after the crash, around 9:56 p.m., California Highway Patrol (CHP) officer Justin Wooten was on patrol on southbound I-15 when he came upon the crash site. Wooten was driving in the number one HOV lane, saw the Pilot blocking the lane, and swerved to avoid hitting it. After he passed the accident, he exited the freeway and returned to the scene. Soon after Wooten passed the scene, CHP officer Garret Larson stopped near the Pilot and found Nevarez pacing near the car. Nevarez told Larson, who was joined by Wooten, "I fucked up. I'm drunk." Nevarez also said he was "drunk and

3

tired, closed his eyes, and he hit the concrete wall." He said after the collision with the wall he could not get out of the car, and within three or four minutes of the collision Sutton's motorcycle struck the Pilot.

Wooten testified Nevarez was exhibiting signs of alcohol intoxication. Wooten conducted a series of field sobriety tests that Nevarez failed. Nevarez also admitted he was drinking at his friend's house before the accident and felt "buzzed." Wooten told Nevarez he was required to provide a breath sample using a preliminary alcohol screening (PAS) device because he was on DUI probation for a prior conviction. Nevarez acknowledged he was on DUI probation, and told Wooten this was going to be a "Watson charge." Nevarez's PAS results, about 90 minutes after the collision, were 0.168 and 0.165 percent. Later, Nevarez provided a blood sample, which showed that over three hours after the crash his blood alcohol level was 0.155 percent.

Nevarez was convicted of driving under the influence in connection with an incident that occurred on October 31, 2021. On that date, around 1:08 a.m., Larson and his partner were patrolling and saw Nevarez driving between 100 and 115 miles per hour on multiple highways. The officers pulled Nevarez over, and he appeared to be under the influence of alcohol. After conducting field sobriety tests, the officers gave Nevarez a PAS test that showed his blood alcohol level was between 0.181 and 0.187 percent.

The officers arrested Nevarez, and Larson read him a *Watson* admonishment, stating: "[D]riving under the influence is dangerous, and while the defendant had not been convicted yet, if convicted, and then involved in a motor vehicle accident in the future where the defendant was under the influence of alcohol, and somebody lost their life as a result of that collision, they could be charged with murder, as opposed to manslaughter."

Two years later, Larson encountered Nevarez at the scene of the present crash.

On December 6, 2023, the People filed a felony complaint charging Nevarez with murder in violation of section 187, subdivision (a) (count 1); gross vehicular manslaughter while intoxicated in violation of section 191.5, subdivision (a) (count 2); DUI causing injury with a prior DUI conviction within ten years in violation of Vehicle Code section 23153, subdivision (a) (count 3); and driving with a blood alcohol content of 0.08 percent or higher causing injury with a prior DUI within 10 years in violation of Vehicle Code section 23153, subdivision (b) (count 4). Multiple special allegations were attached to counts 2, 3, and 4. Nevarez was arraigned and entered a plea of not guilty to all charges.

The preliminary hearing took place on January 27, 2025. The magistrate made a factual finding that the fatal collision in this case occurred "within two minutes" of Nevarez's Pilot hitting the Odyssey. At the hearing, defense counsel argued the People presented insufficient evidence to support the murder charge. Specifically, counsel argued that under *Chagolla, supra*, 102 Cal.App.5th 499, he could not be held to answer for a fatal collision that occurred after he ceased driving.

After extensive argument about *Chagolla*, the magistrate acknowledged both the majority and concurring opinions and concluded this case was "factually distinguished in critical ways" from *Chagolla*. The magistrate bound over on all counts, and added two additional great bodily injury allegations.

On February 10, 2025, Nevarez was arraigned on the amended information and pled not guilty to all charges and allegations. On March 17, 2025, Nevarez filed a motion to set aside counts 1 and 2 under section 995,

5

asserting the charges should be dismissed under *Chagolla*. The People opposed the motion, and Nevarez filed a reply brief. A hearing on the motion took place on April 4, 2025.

At the outset of the hearing, the court acknowledged "the slightly different analyses in the [majority] opinion and concurring opinion" in *Chagolla*. The parties then argued about the import of *Chagolla*. At the conclusion of the hearing, the court denied Nevarez's motion. On April 21, 2025, Nevarez filed the instant petition for writ of prohibition challenging the court's order denying his motion to set aside count 1, and on May 8, 2025 this court issued an order to show cause why the requested relief should not be granted.

DISCUSSION

I

"The law regarding consideration and review of a motion pursuant to section 995 is clear. The magistrate's role at the preliminary hearing is 'to determine whether there is "sufficient cause" to believe defendant guilty of the charged offense.' [Citation.] ' "Sufficient cause" ' in this context means ' "reasonable and probable cause," '—in other words, facts that would lead a person 'of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused.' [Citation.] An information will not be set aside if there is 'some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' " (*Chagolla, supra*, 102 Cal.App.5th at p. 510.)

"Evidence sufficient to justify a prosecution need not be sufficient to support a conviction. (*People v. Scully* (2021) 11 Cal.5th 542, 582.) Probable cause 'signifies a level of proof below that of proof beyond a reasonable doubt, or even proof by a preponderance of the evidence.' " (*Chagolla, supra*, 102

Cal.App.5th at p. 510.)  It is settled "that, when it comes to the required showing for probable cause, the bar is ' "exceedingly low." ' " (*Ibid*.)

"Under section 995, the court must set aside the information if the defendant has been committed without reasonable or probable cause.  (§ 995, subd. (a)(2)(B).)  'When we review a section 995 motion, we "disregard[ ] the ruling of the superior court and directly review[ ] the determination of the magistrate." ' [Citation.]  If the magistrate has made factual findings, those findings are conclusive if supported by substantial evidence.  [Citation.]  But the magistrate's determination regarding the existence of probable cause 'is reviewed as an issue of law.' " (*Chagolla, supra*, 102 Cal.App.5th at p. 510.)

II

" 'Murder is the unlawful killing of a human being … with malice aforethought.' (§ 187, subd. (a).)  Murder committed without premeditation and deliberation is of the second degree.  (§ 189; *People v. Elmore* (2014) 59 Cal.4th 121, 133.)  Malice may be express or implied for second-degree murder.  (§ 188, subd. (a); *People v. Wolfe* (2018) 20 Cal.App.5th 673, 681 (*Wolfe*).)  'Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger.' (*Elmore*, at p. 133.)  Thus, killing a person while driving intoxicated is second-degree murder if 'a person, knowing that his [or her] conduct endangers the life of another,

7

nonetheless acts deliberately with conscious disregard of life.' (*Watson, supra*, 30 Cal.3d at p. 296.)" (*Chagolla, supra*, 102 Cal.App.5th at p. 511.)[2]

In *Watson*, the intoxicated defendant drove through an intersection at 70 miles per hour (in a 35-mile-per-house zone) striking another car and killing a mother and her 6-year old child. (*Watson, supra*, 30 Cal.3d at p. 293.) Before the deadly collision, the defendant drove through a red light, avoiding "a collision with another car only by skidding to a halt in the middle of the intersection." (*Ibid*.) After his arrest, and a half hour after the collision, the defendant's blood alcohol level was 0.23 percent. (*Id*. at p. 294.) The defendant was charged with second-degree murder and vehicular manslaughter, and after the preliminary hearing, the magistrate concluded there was insufficient probable cause to support a finding of implied malice. (*Ibid*.)

On review from that finding, the Supreme Court disagreed with the magistrate. (*Watson, supra*, 30 Cal.3d at p. 295.) *Watson* first rejected the defendant's argument that the Legislature's enactment of the vehicular manslaughter statute precluded a second-degree murder charge for a death that occurs as a result of drunk driving. (*Id*. at pp. 298–299.) The court then set forth the standard for finding implied malice: "second degree murder based on implied malice has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers

---

[2] " 'Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, "I know my conduct is dangerous to others, but I don't care if someone is hurt or killed." The state of mind of the person who acts with conscious indifference to the consequences is simply, "I don't care what happens." ' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987–988.)

the life of another and who acts with conscious disregard for life' "....'
[Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*Id.* at p. 300.)

The court then held the facts at issue were sufficient to show implied malice. Specifically, the court noted that the "[d]efendant had consumed enough alcohol to raise his blood alcohol content to a level which would support a finding that he was legally intoxicated. He had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later." (*Watson, supra*, 30 Cal.3d at p. 300.) Thus, the court stated, "[i]t also may be presumed that defendant was aware of the hazards of driving while intoxicated." (*Ibid.*) The *Watson* majority explained, " '[o]ne who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.' " (*Id.* at pp. 300–301.)

After *Watson*, as noted by the majority opinion in *Chagolla*, "appellate courts … upheld numerous murder convictions in cases where defendants … committed homicides while driving under the influence of alcohol. (See, e.g., *Wolfe, supra*, 20 Cal.App.5th at p. 683 [driver had blood-alcohol level of 0.34 percent, was aware of dangers of drinking and driving and had previously used a taxi service, drank with intention of driving home, and continued driving her damaged vehicle after hitting a pedestrian]; *People v. Autry* (1995) 37 Cal.App.4th 351, 358–359 … [driver had a blood-alcohol level of 0.22 percent, was warned of the dangers of drinking and driving, drank and

9

drove throughout the day, had three near misses, and continued driving over protests of his passengers]; *People v. Murray* (1990) 225 Cal.App.3d 734, 746–747 … [driving wrong way on a freeway with a blood-alcohol level between 0.18 and 0.23 percent]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 533 [crossing into oncoming traffic on two-lane highway with a blood-alcohol level of 0.27 percent]; *People v. Olivas*[, *supra*,] 172 Cal.App.3d [at p.] 989 … [extremely dangerous driving while under influence of PCP and 'negligible' amount of alcohol].)  These opinions have generally relied on some or all of the factors that were present in *Watson*:  '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' "  (*Chagolla, supra*, 102 Cal.App.5th at p. 512.)  "However, 'courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach.' "  (*Chagolla,* at pp. 512–513.)

In *Chagolla*, a defendant under the influence of prescription painkillers led police on a high-speed chase for 40 miles in the early morning, then crashed into a guardrail on Interstate-10, and came to rest blocking the first and second lane of the freeway.[3]  (*Chagolla, supra*, 102 Cal.App.5th at p. 506.)  The defendant did not exit the car, despite police commands, until police shot out one of the car's windows 45 minutes after the crash.  (*Id.* at p. 506.)  However, immediately after the crash, the police shut part of the

---

[3]   The evidence showed Chagolla was under the influence of a large quantity of oxycodone.  Her blood test "revealed 902 nanograms per milliliter" in her system.  (*Chagolla, supra,* 102 Cal.App.5th at p. 506.)  A toxicologist testified that therapeutic ranges of the medication were "between 5 milligrams and 50 milligrams," and "severe health problems would occur if a person had 600 nanograms in their system."  (*Ibid.*)

freeway, which caused rush hour traffic to stop almost entirely. (*Id.* at pp. 503, 507.) Thirty minutes after, and about a mile back from the crash, there was a separate multicar collision caused by the traffic and a distracted semi-truck driver that led to a fatality. (*Ibid.*) The trial court found insufficient evidence at the preliminary hearing to support a murder charge and the People filed a writ of mandate seeking this court's review of the ruling. (*Id.* at p. 503.)

We issued an order to show cause, and ultimately denied relief, but the panel was divided on the rationale. (*Chagolla, supra*, 102 Cal.App.5th at p. 499.) The majority acknowledged the standard set forth in *Watson*, and " 'that there is no particular formula for analysis of vehicular homicide cases, [and that they] instead requir[e] a case-by-case approach.' " (*Id.* at pp. 512–513.) But, the majority noted, the case before it had "one crucial, unique fact not present in *Watson* and its progeny"—at the time of the fatal accident, Chagolla "was not driving her vehicle and had not been driving for 30 minutes." (*Id.* at p. 513.)

The majority explained that although the defendant "created a potential deadly situation that could have supported, under *Watson*, probable cause of implied malice if a deadly accident occurred while [she] was driving, the environment shortly after her vehicle crashed and came to rest on the freeway was somewhat different." (*Chagolla, supra*, 102 Cal.App.5th at p. 513.) The majority stated that while "the driving conditions after Chagolla crashed … present[ed] some danger, … the undisputed evidence showed that the other drivers on … I-10, at least within a half mile of Chagolla's vehicle had safely come to a stop. Thus, the degree of danger seemed to be, at least for the time being and to some degree, abated" at the time of the fatal crash. (*Ibid.*)

11

The majority explained it "was the fact that [Chagolla] remained in her car for so long," blocking traffic, that made the fatal accident more likely, but the question was whether the People had "some evidence that would support a finding of implied malice based on [her] remaining in her vehicle despite it blocking … I-10 and continued commands from CHP officers to exit[.]" (*Chagolla, supra*, 102 Cal.App.5th at p. 514.) The majority framed the dispositive issue in determining the existence of implied malice as whether the defendant "intentionally remained in her car and knew … her action would endanger the life of others." (*Ibid*.) The majority concluded the evidence fell short of such a showing, and instead suggested the defendant had "little awareness of what she was doing." (*Id*. at p. 515.) In rejecting the People's argument that the defendant "volitionally remain[ed]" in the car, the majority stated the "key volitional act under a *Watson* murder is driving," whereas "remaining in a vehicle is a passive activity" and "inaction," and thus does not support a finding of implied malice. (*Id*. at p. 517.)

The concurring opinion, authored by Justice Do, agreed with the result, but took a different approach to resolving the case. Rather than focus on the act of driving to show the existence of implied malice, the concurrence instead concentrated on the element of causation. Justice Do concluded the victim's death was too remote from the defendant's actions to support a finding of proximate cause, which is required to support a murder charge. (*Chagolla, supra*, 102 Cal.App.5th at pp. 518–520 (conc. opn. of Do, J.).)

Justice Do explained, "[m]urder includes both actus reus and mens rea elements. [Citation.] To satisfy the actus reus element of implied malice murder, the ' "natural and probable consequences," ' of the defendant's act must be ' "dangerous to life," ' meaning there is a ' " 'high degree of probability that it will result in death.' " ' " (*Chagolla, supra*, 102

12

Cal.App.5th at p. 522 (conc. opn. of Do, J.).) "An act of the defendant ' "must be the proximate cause of death" ' to satisfy the actus reus element of murder. [Citation.]  Here, proximate cause must be assessed in light of the correct risk element of implied malice murder—a high probability of death—not with the more familiar risk element at issue in civil cases, an unreasonable risk of harm." (*Id.* at p. 523.)

The concurrence asserted "this critical difference … explains why the People failed to demonstrate sufficient probable cause on the element of proximate cause.  When the correct risk element for implied malice murder is considered [,i.e., a high probability of death], it follows that the motorists more than a half-mile away, approaching an unremarkable traffic backup 30 minutes after Chagolla crashed her car, were not within the foreseeable scope of risk for murder liability.  And the high probability of death initially created by Chagolla's driving had dissipated by the time of the second accident down the highway such that there was no longer an operative cause in fact sufficient to find she proximately caused the victim's death." (*Chagolla, supra*, 102 Cal.App.5th at p. 523 (conc. opn. of Do, J.).)

Foreshadowing the present case, the concurrence also expressed concern that the "majority's analysis of implied malice may be misread to preclude a *Watson* second-degree murder charge in circumstances where it could be appropriate." (*Chagolla, supra*, 102 Cal.App.5th at p. 519 (conc. opn. of Do, J.).)  Justice Do stated that although " 'the key volitional act … is driving' …, it does not follow that liability for the high risk of death from a person's decision to drive dangerously or while impaired is automatically cut off when a dangerous or impaired driver passes out or becomes immobilized. One foreseeable consequence of driving under the influence is precisely that the driver will black out, lose control of the car, and then kill another

13

motorist, either as the vehicle continues forward with no one steering or stops in a location where it creates a deadly road hazard that other motorists must try to avoid." (*Id.* at p. 519.)

As Justice Do pointed out, "[u]nder the right circumstances, a postdriving accident that occurs because a driver is no longer capable of volitional conduct can support a *Watson* murder charge. (See *People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1356, 1358–1359, [evidence was sufficient to establish implied malice where defendant admittedly 'fell asleep at the wheel' as a result of methamphetamine withdrawal, lost control of the vehicle, and killed two pedestrians].) The risk of passing out and killing someone—either by losing control of the wheel or suddenly stopping and blocking the road—is a foreseeable and self-evident consequence of driving impaired like Chagolla." (*Chagolla, supra*, 102 Cal.App.5th at p. 521 (conc. opn. of Do, J.).)

### III

As noted, Nevarez argues the majority opinion in *Chagolla* precludes a finding of implied malice because at the time Sutton's motorcycle struck Nevarez's Honda Pilot, Nevarez was no longer driving the vehicle. Nevarez argues *Chagolla* created a bright-line rule that once a driver ceases operating the vehicle, there is no longer any "volitional act" on which to support a finding of implied malice. Nevarez's case, thus, illustrates the problem identified in Justice Do's concurring opinion in *Chagolla*.

The People respond there was sufficient evidence to support the magistrate's finding that Nevarez drove drunk knowing his conduct directly endangered others' lives and, thus, a jury could find implied malice. Further, the People assert the particular accident that occurred, i.e. Sutton's motorcycle striking Nevarez's disabled SUV, was a direct and foreseeable

14

consequence of Nevarez's drunk driving, and thus was proximately caused by him. The People also ask this court to clarify our holding in *Chagolla*, noting two possible interpretations of the case's holding. They argue the case either means that "based on [its] distinct and unusual facts, implied malice was absent" in *Chagolla*, or "in every single case, liability for *Watson* murder automatically ends the moment the DUI driver ceases to drive."

We agree with the People that in this case there is sufficient evidence to support a probable cause finding with respect to both implied malice and proximate cause, and that *Chagolla* should not, as Nevarez argues, be expanded to preclude all liability for murder if a death occurs after the defendant ceases actively driving. As noted, several factors are relevant for assessing implied malice based on drunk driving: "(1) a blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*Talamantes* (1992) 11 Cal.App.4th 968, 973 (*Talamantes*).) Not all of these factors need to be present to sustain a second-degree murder conviction under *Watson* and "there is no particular formula for analysis of vehicular homicide cases." (*People v. Munoz* (2019) 31 Cal.App.5th 143, 152, and *People v. Superior Court* (*Costa*) (2010) 183 Cal.App.4th 690, 698.)

With respect to the actus reus of implied malice murder, Nevarez drove while under the influence, with a high blood alcohol concentration level, and was speeding on a seven-lane freeway at night. Under existing law, this conduct created a high degree of probability of death under the circumstances. (*People v. Reyes* (2023) 14 Cal.5th 981, 989.) This is evidenced by the fact that Nevarez caused a high-speed four-car collision, which disabled his car and led directly to Sutton's death.

15

With respect to the mens rea of implied malice, there was also direct evidence showing Nevarez knew that intoxicated driving endangers human life, but that he chose to drive drunk anyway. As the People point out, there is no clearer evidence of Nevarez's state of mind than his own words to the responding CHP officers that he was drunk, that he "fucked up," that he was currently on DUI probation, and that this was going to be a "Watson charge." Put simply, this evidence provides probable cause that Nevarez was aware that by drinking and driving he could kill and face a murder charge.

In addition, analysis of the factors outlined in *Talamantes, supra*, 11 Cal.App.4th at page 973, also shows there was sufficient evidence of implied malice for purposes of probable cause. First, Nevarez's blood alcohol level was over double the .08 percent legal limit, and was still 0.155 percent nearly three and a half hours after the fatal collision. Second, the evidence supports a finding Nevarez had a pre-drinking intent to drive. Nevarez told the CHP officers he had been drinking at his friend's house in Escondido, and it is reasonable to infer he knew he needed to drive home afterwards. Third, Nevarez had knowledge of the hazards of driving while intoxicated. Two years before the fatal collision he was convicted of a DUI and given a *Watson* advisal. Fourth, and finally, Nevarez engaged in highly dangerous driving, driving more than 100 miles per hour on a seven-lane freeway at night and rear-ending the Honda Odyssey to start the chain of events that led to Sutton's death. These facts provided ample support for the magistrate's finding of probable cause for Nevarez's implied malice.

In addition, the facts here support a finding that Nevarez's drunk driving was the proximate cause of Sutton's death. As Justice Do explained in her concurring opinion in *Chagolla*, to satisfy the actus reus element of murder, the defendant's criminal conduct must be the proximate cause of

16

another's death.  (*People v. Carney* (2023) 14 Cal.5th 1130, 1137–1138 (*Carney*).)  "[P]roximate cause consists of two components.  One is cause in fact (also called actual or direct causation).  ' " 'An act is a cause in fact if it is a necessary antecedent of an event' " ' [citation], and it is commonly referred to as the 'but-for' cause of death.  (See CALJIC No. 3.40; CALCRIM No. 240 ['Causation']; CALCRIM No. 520 ['First or Second Degree Murder with Malice Aforethought (Pen. Code, § 187')].)  The second component ' "focuses on public policy considerations.  Because the purported [factual] causes of an event may be traced back to the dawn of humanity, the law has imposed additional 'limitations on liability other than simple causality.' [Citation.]  'These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy.' " ' " (*Carney, at p. 1138.)

"The limitation on liability under the second component of proximate cause comes down to the question of foreseeability.  [Citation.]  'The object of the criminal law is to deter the individual from committing acts that injure society by harming others, their property, or the public welfare, and to express society's condemnation of such acts by punishing them.  "The purpose of the criminal law is to define socially intolerable conduct, and to hold conduct within ... limits ... reasonably acceptable from the social point of view." ' [Citation.]  'The criminal law thus is clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act.' " (*Carney, supra*, 14 Cal.5th at p. 1139.)

"Foreseeability is also relevant when considering the effect of an intervening act on the chain of causation.  [Citation.]  'To relieve a defendant of criminal liability, an intervening cause must be an unforeseeable and

extraordinary occurrence. [Citation.] The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act.' [Citations.] 'The act of another constitutes a superseding cause precluding responsibility of the initial actor only if the other's conduct is both unforeseeable and causes harm that was not the foreseeable consequence of the initial actor's conduct.' " (*Carney, supra*, 14 Cal.5th at p. 1139; see also *People v. Roberts* (1992) 2 Cal.4th 271, 320, fn. 11 ["there is no bright line demarcating a legally sufficient proximate cause from one that is too remote. Ordinarily the question will be for the jury"].)

We agree with the People that the magistrate properly concluded the evidence of Nevarez's acts constituted probable cause for a finding of proximate cause. First, Nevarez's act of driving drunk was the but-for cause of Sutton's death. Nevarez's erratic driving set into a motion a chain of events directly leading to his car becoming a deadly road hazard blocking the first HOV lane. There is no question this conduct was a substantial—and not insignificant or theoretical—factor contributing to the fatality. In other words, "but-for" Nevarez's actions, the fatal collision would not have occurred. (See *Carney, supra*, 14 Cal.5th at p. 1138.) But-for Nevarez's drunk driving, which caused him to strike the Honda Odyssey and cause a four-car collision, his car would not have crashed and blocked the HOV lane, and Sutton would not have struck Nevarez's car and died.

Further, the danger caused by Nevarez's intoxicated driving was foreseeable and had not dissipated or reached a position of "apparent safety" that could break the causal chain before the fatal collision occurred. (*People v. Caldwell* (1984) 36 Cal.3d 210, 220.) At the time Sutton struck Nevarez's

18

car, traffic was proceeding at a normal pace and had not slowed. Further, the Honda Pilot was disabled and blacked-out, making it difficult for other drivers to see it on the road. Indeed, even Wooten testified he had to take evasive action to avoid hitting the Pilot in the HOV lane. And, the fatal collision occurred within just two minutes of the initial crash, far shorter than the 30 minutes that elapsed between the initial crash and second crash at issue in *Chagolla*. These facts support the conclusion, for purposes of the probable cause analysis, that Sutton's death was a reasonably foreseeable, i.e. proximate, result of Nevarez's actions. Accordingly, we reject Nevarez's request to reverse the probable cause finding.

IV

Finally, we take this opportunity to clarify the holding of *Chagolla*. As noted, Nevarez argues *Chagolla* requires the defendant to be engaged "in the volitional act of driving in order to be liable for murder in a vehicular homicide." He points to the majority's statement that "Chagolla's act of reckless driving while intoxicated created a potential deadly situation that could have supported, under *Watson*, probable cause of implied malice if a deadly accident occurred while Chagolla was driving." (*Chagolla, supra*, 102 Cal.App.5th at p. 513.) He also points to the majority's statement that "the key volitional act under a *Watson* murder is driving." (*Id*. at p. 517.)

First, as with all appellate opinions, the holding of *Chagolla* is confined to the specific facts before the court in that case. (See *Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 ["An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' "].) *Chagolla* presented an unusual scenario and a far more attenuated chain of events leading to the fatality there than the facts at issue here. That attenuation created questions about both the

19

existence of implied malice and proximate cause, which resulted in two opinions that resolved the attenuation question in different ways—but which led to the same result.

As discussed, the majority found that implied malice was lacking because the relevant act was not the defendant's driving while intoxicated, but instead her act of staying in the car after it crashed in the middle of the I-10 freeway. The opinion framed the relevant question as whether the defendant "intentionally remained in her car and knew that her action would endanger the life of others." (*Chagolla, supra*, 102 Cal.App.5th at p. 515.) The majority concluded this act did not support a finding of implied malice because "the evidence did not even suggest that Chagolla intentionally remained in her vehicle after it came to a stop or that she appreciated the danger of remaining in the vehicle." (*Ibid*.) Rather, the evidence "led to the undeniable conclusion that Chagolla exhibited little awareness of what she was doing and the consequences of her failure to exit her vehicle." (*Id*. at p. 499.)

The majority rejected the People's assertion that the defendant " 'volitionally and intentionally refused to exit the vehicle' " and concluded implied malice was lacking under this analytical framework. (*Chagolla, supra*, 102 Cal.App.5th at p. 516.) This approach was suitable in *Chagolla* because of the unique set of facts in that case. Particularly, the length of time between the defendant's initial actions and crash and the subsequent collision, and because of the physical distance between the two crashes. The facts here are far different.

In contrast, Justice Do's concurrence focused on the lack of evidence to support a finding of proximate cause. Justice Do concluded that second-degree murder was not available because the death at issue was not

20

sufficiently foreseeable. (*Chagolla, supra*, 102 Cal.App.5th at pp. 518–520 (conc. opn. of Do, J.).) The concurrence disagreed with the majority's conclusion that there was insufficient evidence of implied malice, explaining "[i]t is well settled that exceptionally hazardous driving that causes a fatal traffic collision may support a conviction for second degree murder based on the mental state of implied malice." (*Id.* at p. 520.) Thus, "a jury could readily conclude Chagolla demonstrated a conscious disregard for the lives of her fellow motorists at the point in time when she decided to lead police on a 35-to 40-mile chase at speeds in excess of 100 miles per hour on a highway full of vehicles while under the influence of oxycodone." (*Ibid.*)

Justice Do then concluded proximate cause was lacking because the type of fatality that occurred was not foreseeable: "the scope of risk for implied malice murder extends only to the class of persons who are foreseeably subject to a high probability of death by the defendant's conduct and only with respect to those risks or hazards whose likelihood made the conduct potentially deadly." (*Chagolla, supra*, 102 Cal.App.5th at p. 530 (conc. opn. of Do, J.).) "Chagolla's driving foreseeably created a high probability of death for all the motorists in her way as she sped down the highway, for the officers who pursued her, and for the motorists who had to brake suddenly in the immediate aftermath of her collision with the guardrail as she spun out of control and blocked the highway. [Citation.] They were all members of the class of persons for whom death was highly probable. But the motorists who encountered the resulting traffic stoppage more than a half-mile away and a half hour later were not." (*Id.* at p. 531.)

Justice Do's approach, thus, resolved the case without creating the risk of cutting off implied-malice murder liability for cases in which the death occurs after "a dangerous or impaired driver passes out or," as in this case,

"becomes immobilized." (*Chagolla, supra*, 102 Cal.App.5th at p. 519 (conc. opn. of Do, J.).)  In our view, either approach taken in *Chagolla* does not preclude lability in this case.

However, we agree with the People that Nevarez's expansive reading of the majority opinion in *Chagolla* to preclude murder liability unless the defendant is actively driving is inappropriate and leads to absurd results. Faced with a highly unusual set of facts, the majority concluded there was no evidence the defendant intended to cause the second accident, and thus implied malice was lacking.  However, we do not read the majority opinion as eliminating implied malice murder anytime an intoxicated driver is no longer actively driving.  Rather, as the majority noted, every unique case requires an examination of each element of the crime at issue, including consideration of both the existence of implied malice and proximate cause.  (See *Chagolla, supra*, 102 Cal.App.5th at pp. 512–513 [" 'courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach' "].)

Here, as we have explained, the facts presented support a finding of probable cause both with respect to Nevarez's mens reus, or mental state, of implied malice and his actus reus, or actions, proximately causing Sutton's death.  Accordingly, the magistrate properly held Nevarez to answer for the crime of second-degree murder as a result of his drunk driving.  The fact that Nevarez was no longer driving at the time his car was struck by Sutton's motorcycle did not negate the existence of implied malice, and *Chagolla* does not require us to hold otherwise.  As the People assert, "[t]he law requires a fact-specific causation analysis—not a rigid, bright-line rule that allows those who engaged in egregious, life-threatening conduct to escape accountability."

DISPOSITION

The petition is denied.

McCONNELL, P. J.

WE CONCUR:

IRION, J.

KELETY, J.